# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 24, 1998 Session

## STATE OF TENNESSEE v. JAMES HENDERSON DELLINGER & GARY WAYNE SUTTON

**Appeal as of Right from the Criminal Court for Blount County**
**No. C-6670    D. Kelly Thomas, Jr.,**

---

### No. E1997-00196-CCA-R3-DD
### March 7, 2001

---

On April 6, 1992, the Blount County Grand Jury indicted Appellants James Henderson Dellinger and Gary Wayne Sutton for one count each of first-degree murder in the death of Tommy Griffin. Following a jury trial, the Appellants were convicted of first degree murder. After a subsequent sentencing hearing the jury imposed the death penalty on both appellants. They raise thirty five alleged errors concerning both the guilt and sentencing phase of their trial. After a review of the entire record we have concluded there is no reversible error and we therefore AFFIRM the verdict.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J. concur, PAUL G. SUMMERS, J., not participating.

Eugene B. Dixon; Charles Deas, Maryville, Tennessee, for appellant, James Henderson Dellinger, and F.D. Gibson, Maryville, Tennessee and John Goergen, Knoxville, Tennessee, for the appellant, Gary Wayne Sutton.

John Knox Walkup, Attorney General & Reporter; Michael E. Moore, Solicitor General; Kenneth W. Rucker, Assistant Attorney General; and Mike Flynn, District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. FACTS

Stella Griffin Whitted testified that she was the sister of the victims in this case, Tommy Griffin and Connie Branam. She testified that her brother had been twenty-four years old at the time

of his death and had walked with a pronounced limp due to an earlier amputation of one of his legs. She also testified that her sister was thirty-three years old at the time of her death.

Jamie Carr testified that she was working as a barmaid at Howie's Hideaway Lounge in Maryville, Tennessee on February 21, 1992. Carr stated that during her shift, Appellants and an individual whom she later learned was Tommy Griffin arrived in a dark blue Camaro or Trans Am. The three men sat in a booth and began drinking beer.

Terri Newman testified that when she arrived for work at Howie's Hideaway on February 21, 1992, a blue Camaro or Grand Prix was parked in her parking space. When Newman entered the establishment, she saw Appellants and Griffin drinking beer and shooting pool. Newman stated that the three men left Howie's Hideaway at approximately 7:00 p.m.

Cynthia Walker testified that on February 21, 1992, she and Kevin Walker were returning to Knoxville from Maryville when she saw a dark-colored Camaro parked in the emergency lane of the Alcoa Highway. Ms. Walker stated that she thought there might have been a fight because it appeared that someone was being pulled from the passenger side of the Camaro.

Kevin Walker testified that he had also seen the altercation that occurred in and around a dark-colored Camaro that had only one headlight. Mr. Walker stated that after he saw a person who was outside of the Camaro fighting with a person who was inside the Camaro, he used his radio to report the incident to Blount County authorities. Mr. Walker stated that the incident happened at approximately 7:00 p.m.

Sharon Davis testified that she and her family had also been driving along Alcoa Highway at approximately 7:00 p.m. on February 21, 1992, when she noticed a man on the side of the road who was not wearing a shirt or shoes and who appeared to be stumbling around. Davis stated that she and her family traveled approximately one mile down the road to eat at the Waffle House, and upon their return, she saw a dark-colored Camaro that was near the place where she had seen the man who was not wearing a shirt or shoes. Davis also saw two men by the Camaro who appeared to be searching for something or someone.

Sandra Hicks testified that while she was working as a dispatcher at 7:11 p.m. on February 21, 1992, she received a report about a fight involving some people in a black or dark-colored Camaro. Hicks then dispatched Officer Steven Brooks to investigate.

Officer Steven Brooks of the Alcoa, Tennessee Police Department testified that he received the dispatch about a possible fight at approximately 7:00 p.m. When Brooks arrived at the scene approximately two minutes later, he observed nothing unusual. Brooks then made a routine traffic stop and when he began questioning the occupants of the vehicle, he noticed another vehicle on Hunt Road that was flashing its lights erratically. Brooks then radioed Officer Drew Roberts and requested that Officer Roberts check on that vehicle.

Brooks testified that when he subsequently joined Roberts, he saw two men standing beside a S-10 pickup and saw another man sitting on the tailgate of the truck. Brooks stated that the man on the tailgate was not wearing a shirt and it appeared that he had been involved in a fight because he was upset and he had abrasions on his back and neck.

Officer Drew Roberts testified that when he questioned the man who was not wearing a shirt, the man told the officers that his name was Tommy Griffin and that he lived in Sevier County. Griffin initially told the officers that an argument had taken place and that some friends put him out of the car, but when questioned further, he stated that the men were not really his friends. Griffin

refused to give any other information. Roberts subsequently arrested Griffin for public intoxication and took him to the Blount County Jail.

Sergeant Ray Herron testified that Griffin was booked into the Blount County jail at 7:40 p.m. on February 21, 1992. Herron stated that approximately forty-five minutes later, appellant Dellinger approached him to see when Griffin could be released. Herron told Dellinger that Griffin would be kept a minimum of four hours. Herron stated that Griffin was subsequently released from jail at 11:25 p.m. when Dellinger returned to the jail and posted a cash bond.

Captain Kenneth Beeler testified that on February 21, 1992, he saw both Appellants in the lobby of the Blount County Jail at approximately 11:15 p.m. Lieutenant Tom Defoe testified that on the evening of February 21, 1992, he saw Appellants enter the lobby of the Blount County Jail and he noticed that one of them was carrying a shirt. Shortly thereafter, Defoe saw Appellants leave the jail with an individual who had just been released.

Alvin Henry testified that he lived in the same neighborhood as both Dellinger and Griffin. Henry stated that at approximately 9:00 p.m. on February 21, 1992, he looked out the window of his residence when his dog started barking. When Henry looked down the road, he saw someone getting in Dellinger's white pickup truck. Henry then saw the truck drive up the road and pull into Dellinger's driveway. A few seconds later, Henry looked back down the road and noticed that flames were shooting out of Griffin's trailer.

Jennifer Branam, Griffin's niece, testified that on the night of February 21, 1992, her sister came into her bedroom and yelled that Griffin's trailer was on fire. Jennifer Branam then awakened her father and ran to Dellinger's trailer to see whether Griffin was there. Jennifer Branam stated that she believed that Dellinger was at home because his truck was in the driveway. She then knocked on the door and Linda Dellinger answered. Jennifer Branam stated that when she asked whether Dellinger was home, Linda said that he was not there. However, Jennifer Branam then saw both Appellants walking down the hall. She also noticed that they were both wearing jackets and their pants were wet up to their knees. When Jennifer Branam asked Sutton if Griffin was in the trailer, Sutton replied that Griffin was in Blount County with a girl. Jennifer Branam then asked both Appellants to accompany her to Griffin's trailer, but Dellinger said he could not go because he was in enough trouble already.

Jennifer Branam testified that later that night, she saw Appellants move an object from Dellinger's truck to Linda Dellinger's car. Jennifer Branam stated that the object was two to three feet long and it was covered with a sheet. She stated that Appellants then left in the car. The following morning, Jennifer Branam saw Dellinger remove the object that had been put in the trunk of his wife's car and place it under his trailer. She stated that the object looked like a shotgun.

Herman Lewis, a neighbor of Griffin, testified that at approximately 10:00 p.m. on February 21, 1992, he saw someone who looked like Dellinger come out of the Dellinger trailer and put something white that was about the size of a walking stick in the back of a car. He stated that two people had been in the car when it drove away, but he admitted that he could not identify the two people.

Sandy Branam, another of Griffin's nieces, testified that she had a conversation with Dellinger at approximately 9:00 p.m. on February 21, 1992, during which she inquired about Griffin. She stated that defendant Dellinger told her that Griffin was at the Blount County Jail and that he and Sutton were going to get him out of jail. Sandy Branam also stated her mother had previously

complained that there was a faulty plug behind the television set in Griffin's trailer.  She also stated that she saw three vehicles in the Dellinger driveway on the night of the fire: an Oldsmobile, a white truck, and a Camaro.  Sandy Branam also testified that around noon on February 22, 1992, her mother, Connie Branam, stated that she was going to look for Griffin in Blount County.

Jason McDonald testified that at 11:55 p.m. on February 21, 1992, he heard two or three gunshots coming from the Blue Springs/Blue Hole area near his home.  Brenda McKeehan, McDonald's mother, testified that she also heard two gunshots on the evening of February 21, 1992.

Jerry Sullivan, owner of a grocery store in Townsend, Tennessee, testified that on the afternoon of February 22, 1992, Connie Branam came into his store in search of information concerning her brother, Griffin.  She showed store employees a picture of her brother and asked Sullivan if she could leave her car in his parking lot.  Sullivan testified that when he accompanied Branam outside to ensure that her car was not blocking anyone, he saw her talking to two men in a white pickup truck.  He stated, however, that he did not get a good look at the men and he could not identify them.

Jamie Carr testified that she was working at Howie's Hideaway on February 22, 1992, when Appellants came in with Connie Branam.  Carr stated that Branam was looking for her brother and she was crying.  When Branam began telling Carr about Griffin's trailer burning down, Dellinger interrupted by asking whether Carr remembered if Dellinger had been in the bar the previous day.  When Carr told Dellinger that she definitely remembered him from the previous day, he continued to interrupt her by asking if she was sure that she remembered that he had been in the bar the day before.  Carr testified that Dellinger then stated that he thought that Griffin might have returned to the bar after he was released from jail.  Dellinger then told Carr that he left Griffin with a woman down the road.

Terri Newman testified that when she arrived for work at Howie's Hideaway at 5:00 p.m. on February 22, 1992, Appellants were in the bar with Connie Branam.  Newman stated that Dellinger immediately asked her if she remembered him and Sutton from the day before.  Branam then said that she was looking for her brother and wanted to know with whom he had left the bar.  Newman stated that she was confused because she knew that Griffin had left the bar with Appellants.  Newman also stated that Dellinger told her that he and Sutton brought Griffin into the bar after he was released from jail, but Newman remembered that the group left at approximately 7:00 p.m. the prior evening.

Newman testified that Branam became "friendlier" with Dellinger after she consumed some alcohol and Dellinger subsequently became jealous when Branam began flirting with another man who was in the bar.  Newman stated that Sutton subsequently attempted to get her to go with the three of them to look for Griffin, but she refused.  She stated that Sutton then told her that her husband would be surprised when she ended up missing one morning.  Newman saw Branam leave with Appellants at approximately 6:30 p.m.

James Gordon testified that while he was in the Clear Fork area of Sevier County at approximately 8:00 p.m. on February 22, 1992, he heard a high-pitched whistle sound in the nearby woods. When he looked into the woods, he saw a fire approximately two hundred yards away. Mr. Gordon stated that because he thought the fire was started by campers, he made no further investigation. However, at approximately 7:00 p.m. on February 28, 1992, he and his foster son were in the area of the fire and they found a burned vehicle that contained a body.

Barbara Gordon testified that the day after the fire, she saw a white truck coming from the scene of the fire that was traveling at a high rate of speed. She stated that the truck appeared to have two occupants.

Thomas Carter testified that while he and his children were fishing in the Blue Hole area of Blount County on February 24, 1992, his daughter informed him that a man was lying on the side of the riverbank. Carter stated that when he investigated and saw the man lying face down, he called 911. Carter stated that he could see that the man had a bloody wound on the back of his head.

Gary Hamilton of the Blount County Sheriff's Department testified that he went to the Blue Hole crime scene on February 24, 1992. Hamilton stated that he subsequently located the body and he also found two spent twelve-gauge shotgun shells and two empty beer cans by the body.

Dr. William Bass, an expert in forensic anthropology, testified that he had been called by the Sevier County Sheriff's Department to conduct an analysis of the scene where the body had been found in the burned car. Dr. Bass identified a photograph of the burned vehicle and stated that a body was found lying in the front seat. He stated that in light of his experience in investigating deaths, it appeared that an accelerant was poured in the vehicle due to the burn pattern. He testified that because the victim's arms and legs had been burned off and the skull had been cremated at the top, he determined that something would have had to have been added to the vehicle to present such a high amount of burning. Dr. Bass stated that the body was so extensively burned that he had been unable to determine a cause of death, however, a positive identification of the victim as Connie Branam had been made from dental records. Dr. Bass also stated that a rifle cartridge shell was found at the scene.

Gary Clabo, an arson investigator for the State of Tennessee, testified that he was notified of a fire involving an automobile and a dead body on February 28, 1992, and that he arrived at the scene at approximately 11:00 p.m. Due to the darkness, an officer guarded the vehicle that night, and Clabo began his investigation the next morning. Clabo testified that the vehicle was burned severely and the interior was almost totally destroyed. Following a detailed investigation, he concluded that the fire did not begin in the engine compartment because the engine components were essentially intact. Rather, burn patterns indicated that the fire had started in the front seat area and that an accelerant had been placed on the floor to make it burn hotter and faster. Clabo concluded that the fire had been set by human hands with the use of an outside ignition source.

Clabo then testified that he had investigated the fire that destroyed Griffin's trailer. After explaining his method of investigation, Clabo opined that the trailer fire had also been set by human hands and that a liquid accelerant had been used. He stated that he had checked the electrical system and appliances and concluded that there was no evidence of any electrical-caused fire from those items.

On cross-examination, Clabo admitted that he took samples from the vehicle to be tested for accelerants, but the report he obtained from the Tennessee Bureau of Investigation ("TBI") lab did not reveal any petroleum distillate. However, Clabo stated that it was not unusual to get a negative report from the TBI lab due to consumption and evaporation. Clabo also stated that the high whistling sounds heard by James Gordon could have been caused by contents of aerosol cans in the trunk leaking out or by the burning of the seats or a tire. Clabo admitted that none of Griffin's

neighbors had noticed the smell of any petroleum-based product during or after the fire. Clabo also admitted that he had not sent any samples from the trailer to the TBI lab to be tested for accelerants.

Dr. Eric Ellington testified that when he conducted an autopsy of Griffin's body on February 25, 1992, he immediately noted that Griffin only had one leg and he had incurred a wound to the back of his head that was an inch and a half in diameter. Dr. Ellington testified that the cause of death was massive trauma or injury to the brain stem which was completely destroyed by a gunshot. Dr. Ellington testified that he removed the brain from the skull and retrieved two metal pellets and two objects which he concluded to be wadding. He stated that he gave those objects to Deputy Larry Muncy.

On cross-examination, Dr. Ellington testified that because he was not trained in forensic pathology, he had not attempted to determine the time of death. However, Dr. Ellington stated that the emergency technician's report indicated that rigor mortis was present in Griffin's body when it was recovered at 5:50 p.m. on February 24, 1992. Dr. Ellington stated that according to textbooks he had studied, rigor mortis sets in about thirty minutes after death and lasts from twenty-four to thirty-six hours after death.

James Widener, criminal investigator for the Blount County Sheriff's Department, testified that he executed a search warrant for Dellinger's trailer and surrounding property on February 28, 1992. Widener stated that the purpose of the search was to look for shells, shotgun shell casings, and a shotgun. He stated that several expended shotgun shells were recovered in both Dellinger's yard and in an adjacent yard. He stated that a .303 rifle and a Mossberg shotgun barrel were found in Dellinger's bedroom. On cross-examination, Widener admitted that it appeared that Dellinger was a gun trader or collector and that various people he interviewed had stated that shooting and target practice often took place in Dellinger's yard.

Don Carman, special agent with the TBI, testified that after an extensive investigation, his office concluded that the .303 rifle shell recovered from the scene of the burned vehicle was fired from the rifle that was found in Dellinger's home. He also testified that shotgun shells found in Dellinger's yard and the surrounding area and the shells found near Griffin's body had been fired from the same shotgun.

Joseph Mason, firearms expert employed by the United States Treasury Department, testified that he had examined the shell casings that were recovered during the investigation of this case. Mason stated that he had determined that seven of the twelve-gauge shotgun cartridges delivered to him for examination were fired from the same shotgun, including two shells found near Griffin's body.

Detective Widener was recalled to testify that he had interviewed both Appellants and that he had recorded the interviews. Sutton's tape recorded statement was then played for the jury, but after listening to it, the jury informed the trial court that they had been unable to glean anything from the poor recording. Detective Widener then testified during a jury-out hearing that he had examined the transcript of the statement and that the transcript was accurate. The transcript of Sutton's statement was then submitted to the jury.

On cross-examination, Detective Widener admitted that both Appellants had maintained their innocence throughout their entire interrogation and statements. When questioned about witnesses' recollection of the type of Camaro they saw on the Alcoa Highway on the night of the murder,

Widener admitted that their description might not have matched the exact model of the Camaro owned by Sutton. Widener also stated that he had been told that Dellinger was like a father to Griffin and that Sutton was like a brother to him. He admitted that evidence showed that Dellinger had bailed the victim out of jail on numerous occasions. He also stated that Dellinger had given him an unusual amount of detail concerning a dark-haired woman with whom he had last seen the victim and that Sutton had given an identical description.

Mark Turner, Director of the Narcotics Unit at the Sevier County Sheriff's Department, testified that he saw Sutton on March 2, 1992, driving a 1984 Camaro with a large hood scoop and only one headlight in working condition.

Numerous witnesses testified on the behalf of Appellants that they had previously shot shotguns at Dellinger's property and that Griffin had been friends with both Appellants.

Dr. Wayne Stewart, a family physician, testified that he had treated Connie Branam as a patient and that on one occasion he treated her for injuries related to an assault committed by Jack Sutton. Dr. Stewart stated that he had treated Branam for numerous ailments including severe sinusitis, recurring abdominal camps, and grief over the loss of her father and worry over the medical condition of her mother. He also stated that he had treated Branam for panic attacks and acute grief and had prescribed valium, xanax, and vicodan on occasion.

Matthew Cubberley, patrolman for the Sevier County Sheriff's Department, testified that on February 10, 1992, he was called to the home of Connie Branam on a report that Branam had taken an overdose of drugs. Cubberley stated that when he arrived at the scene, Branam attacked him and he arrested her for assault and took her to the emergency room. Cubberley also stated that Branam was transported to a mental institution for a few days, and that the assault charges were subsequently dropped.

Dr. Ittoop Maliyekkel, psychiatrist at Lakeshore Mental Health Institute, testified that he treated Connie Branam when she was transported to the Lakeshore facility and that she suffered from acute depression. Dr. Maliyekkel also testified that a different drug other than the one she overdosed on was found in Branam's urine drug screen and that he warned her that mixing medications could be fatal. On cross-examination, Dr. Maliyekkel stated that the discharge summary report reflected that when Branam left Lakeshore three days after being admitted, she appeared sober, was not psychotic or depressed, and had no suicidal ideation.

Carolyn Weaver testified that she had been Sutton's girlfriend in February of 1992. Weaver stated that she had seen Sutton and Dellinger at the home of Sutton's brother at approximately 7:00 p.m. on February 21, 1992. Weaver stated that Sutton had taken his car to be examined by his brother and that Sutton had borrowed his brother's truck because the radiator on Sutton's Camaro was broken. Weaver stated that she and both Appellants left at approximately 8:00 p.m. in a white pickup truck and went to Dellinger's home. Weaver stated that Griffin had not been with Appellants and that Griffin's trailer had definitely not been on fire when she and Appellants dove past it. Weaver stated that Appellants left Dellinger's residence at approximately 10:00 p.m. in order to get Griffin out of jail. Weaver stated that Appellants returned about midnight and there was nothing unusual about their dress at that time.

Weaver testified that she stayed with Sutton at Dellinger's trailer on the night of February 21, 1992, and she left the next morning with Linda Dellinger to do some shopping. When she

returned, Appellants were gone. Weaver stated that Appellants returned at approximately 8:00 p.m. that evening and she and Sutton stayed with the Dellingers on the night of February 22, 1992.

Weaver testified that she had been to Griffin's trailer on occasion and she had noticed that it was not clean and that wires had been "hanging around." She also stated that she had seen holes in the stovepipe and a burned place in the floor. She stated that she knew that Griffin was afraid of his brother James Griffin because James had often beaten him up.

Tim Nichols, a volunteer fireman with the Sevierville Fire Department, testified that he was the head of the fire crew that answered a call for the fire at Griffin's trailer on February 21, 1992. Nichols testified that he had a conversation with Connie Branam that evening in which she stated that bad wiring might have caused the fire. Nichols stated that the trailer had been a total loss and that he did not call an arson investigator because he had no reason to suspect arson at that time. He also testified that he did not smell the odor of gasoline or any other chemical at the fire scene.

Captain Larry McMahan of the Sevier County Sheriff's Department testified that he acted as chief investigator in the Connie Branam case and that he assisted in the investigation of this case. McMahan testified that none of the items gathered at the scene where Connie Branam's body had been found, when tested, had resulted in fingerprints of Appellants being found. He also testified that dirt samples taken from the shoes of Appellants did not match samples of dirt taken from the scene where Branam's body was found.

On cross-examination, Captain McMahan testified that the shotgun that had fired the shells in this case had never been recovered. McMahan also admitted that he did not test the fingerprints of other potential suspects such as Bill Cogdill, Eddie Blair, or James Griffin for potential matches of prints taken from items found at the Connie Branam fire scene. He also stated that a partial tire track found at the Branam fire scene did not match the tracks of Dellinger's vehicle.

Charles Currier, a resident of the area near where Griffin's body was discovered, testified that it was not unusual to hear gunshots around that area because people often practiced shooting there. Katherine Turner, another resident of the area, corroborated his testimony.

William Dewitt was called by the defense as a fire-investigation expert and was qualified as such by the court. Dewitt testified that new scientific evidence revealed that irregular burn patterns were not always indicative that an accelerant had been used. Dewitt stated that if the presence of ignited liquids is suspected, samples should always be taken. He further stated that the type and quantity of combustible materials found in automobiles today, when burned, can produce a degree of damage much like that caused by an accelerant. After being provided information about the fires of the trailer and the vehicle, Dewitt opined that the cause of the fires should have been listed as "undetermined."

Robert Webb, Chief Operations Manager for Tennessee for the EMS Division, testified that he received a call in February of 1992 to investigate a dead body that had been found on the banks of the Little River in Blount County. Webb testified that he assisted in loading the body, and it was his opinion that rigor mortis had set in at that time. Neal Stone, a medic for the Rural Metro Ambulance Corporation, testified that he also assisted in the recovery of the body of the victim and that it was his opinion that rigor mortis was present.

Martha Blair testified that in February of 1992, she lived with her ex-husband, Eddie Blair. Ms. Blair stated that shortly after Griffin's body was found, officers came to her home to speak with Mr. Blair. She stated that the officers searched Mr. Blair's car thoroughly and also found shell

casings from a 12-gauge shotgun in her yard. Ms. Blair stated that in February of 1992, Mr. Blair owned a 12-gauge shotgun and he took the gun with him everywhere that he went. She stated, however, that the shotgun had mysteriously disappeared before the officers visited her home.

Ms. Blair testified that two unusual incidents occurred about the time that Griffin was killed that caused her concern. First, Mr. Blair came home and threw his clothes in the trash and told her that he was throwing them away because they were muddy. She stated that in the twenty years that she and Mr. Blair had lived together, she had never known him to throw away any muddy clothes. The second incident that concerned Ms. Blair was that the next morning Mr. Blair took the trash out to his car, something he had never done before.

Robert Whiteman, park ranger with the Great Smoky Mountains National Park, testified that he checked into the records of the park service at the request of defense counsel, and in February of 1992, the park owned four white Dodge pickups. He further testified that rangers who drove two of the pickups might have had occasion during that time to be in the area where the body of Connie Branam had been found.

Jack Sutton testified that in February of 1992, an individual by the name of Bill Cogdill told him two or three days before Connie Branam's body was found that her body would either be found in water or a burned vehicle.

Dr. Larry Wolfe, a physician employed by Mountain People's Health Council, testified that he had been provided with autopsy photographs of Griffin and he had opined that Griffin died as a result of a single gunshot wound to the back of the neck. From the photographs, he estimated that the time of death was twenty-four to thirty-six hours prior to the time the body was discovered. After reciting a list of factors he had considered in determining the time of death, he testified that the victim appeared to have been in a state of rigor mortis and rigor mortis is complete at twenty to twenty-two hours after death and dissipates at about that same rate. Dr. Wolfe also noted the presence of postmortem goose bumps on Griffin's body which would further indicate complete rigor mortis. Dr. Wolfe stated that he also considered the factors of lividity, marbling of the skin, redness of the blood, and stage of decomposition of the organs in making his determination as to the time of death. He testified that if Griffin's body had been lying out in temperatures reported during the sixty to sixty-six hour time period suggested by the State, he would have expected gross changes in Griffin's body that would have been readily apparent.

Dr. Wolfe then testified about the drugs that had been prescribed for Connie Branam. Dr. Wolfe testified that according to reports, xanax, vicodin, and sinequan had been prescribed for Branam in the last week of her life and she had been hospitalized during that time for adjustment reaction, severe depression, suicidal gestures, and alcohol abuse. According to Dr. Wolfe, any individual who had been taking xanax and sinequan and been drinking alcohol would have behaved in an intoxicated state and would have experienced extreme mood swings and disinhibition. He testified that if an individual had taken enough of the drugs, he or she might not respond to intense pain due to being in a comatose state. Defense counsel then hypothesized that an individual in such a state might be able to drive a car, wander into the woods, stop the car, light a cigarette, pass out, and then die of cardiac arrest, renal failure, or respiratory arrest. Dr. Wolfe responded that this hypothetical was a possibility.

On cross-examination, Dr. Wolfe admitted that he was not board-certified in forensic pathology and that when he was the medical examiner in Union County, all autopsies were

performed elsewhere. He also admitted that he had never spoken with the physician who conducted the autopsy on Griffin.

In rebuttal, the state called Beverly Sparks, custodian of records for the Sevier County Sheriff's Department, to introduce into evidence two missing persons reports filed by Viola Griffin, the mother of Griffin and Branam, on Monday, February 24, 1992. In the reports, Ms. Griffin stated that she had not seen or heard from Griffin since February 21, 1992, at 11:45 p.m. and she had not seen or heard from Branam since February 22, 1992, at 1:00 p.m.

Dr. Charles Harlan, forensic pathologist, was accepted as an expert witness by the court. Dr. Harlan testified that after reading Dr. Ellington's autopsy report for Griffin, it was his opinion that Griffin died between 6:00 p.m. on February 21, 1992, and 8:00 a.m. on February 22, 1992. Dr. Harlan based this opinion on the fact that decomposition of organs was apparent on the microscopic examination. Dr. Harlan also testified that he had reviewed the testimony of Dr. Wolfe and he disagreed with many of the conclusions that Dr. Wolfe had made from viewing the evidence in the case.

## II. SEPARATE JURIES FOR EACH APPELLANT

Appellants contend that the trial court erred when it refused to grant their request for a separate jury for each Appellant.[1] We disagree.

The record indicates that in their motion for separate juries and during the hearing on the motion, Appellants argued that they were entitled to separate juries because Appellants would be prejudiced when the trial court admitted evidence that was admissible as to one Appellant but was inadmissible as to the other Appellant. However, when the trial court denied the motion, the court stated that it would not admit any evidence that was admissible as to one Appellant but was inadmissible to the other Appellant.[2] Thus, the trial court found that there was "[no] reason that the State and both [Appellants] can't have a fair trial before the same jury."

As support for their argument on this issue, Appellants have cited a few federal court cases in which separate juries were used. However, Appellants have failed to cite any authority that would require separate juries in a case such as this one. Indeed, the general rule is that the decision of whether to grant a motion for severance is within the discretion of the trial court and the trial court's decision will not be reversed absent a showing of prejudice. See State v. Robinson, 971 S.W.2d 30,

---

[1] Initially, we note that Appellants have failed to support the argument for this issue and for many subsequent issues with appropriate citations to the record. For instance, Appellants have completely failed to identify the part of the record that contains their motion for separate juries, the part of the record that contains any argument on the motion, and the part of the record that contains the trial court's ruling on the motion. Rule 27(g) of the Tennessee Rules of Appellate Procedure specifically states that "reference in the briefs to the record shall be to the page of the record involved." Further, Rule 10(b) of the Rules of the Tennessee Court of Appeals states that "[i]ssues which are not supported by . . . appropriate references to the record will be treated as waived by this court."

[2] For example, the trial court ruled that the State could not introduce a statement by Dellinger in which he threatened to "wipe out the whole hill" of Griffins because there was no evidence that Sutton had adopted the statement.

40 (Tenn. Crim. App. 1997); State v. Ensley, 956 S.W.2d 502, 508 (Tenn. Crim. App. 1996).[3]  In this case, Appellants have failed to meet their burden of showing that the trial court abused its discretion.  In fact, Appellants have failed to identify a single instance in which one Appellant was prejudiced by the introduction of evidence that was only admissible against the other Appellant.  In addition, Appellants have failed to identify any other way in which the trial court's denial of their motion prevented them from having a fair trial.  This issue has no merit.

### III.  SEPARATE JURIES DURING THE GUILT AND SENTENCING PHASES

Appellants contend that the trial court erred when it denied their motion for separate juries during the guilt and sentencing phases of trial.  We disagree.[4]

First, Appellants contend that having the same jury during the guilt and sentencing phases is unconstitutional because it deprived them of their right to a fair trial.  Specifically, Appellants contend that the current system is unfair because the State's ability to challenge jurors that have personal views against the death penalty[5] leads to a system where the jury is more likely to convict.  However, the Tennessee Supreme Court has previously considered and rejected this argument. See State v. Harbison, 704 S.W.2d 314, 318–319 (Tenn. 1986) (rejecting the argument that a defendant is entitled to separate juries during the guilt and sentencing phases of a capital trial in order to guarantee a fair trial by a jury that represented a cross section of the community); State v. Zagorski, 701 S.W.2d 808, 814–15 (Tenn. 1985) (rejecting the argument that a defendant is entitled to separate juries during the guilt and sentencing phases of a capital trial on the theory that a "death qualified" jury is skewed toward a finding of guilt in contravention of the right to a fair and impartial jury composed of a cross-section of the community); see also State v. Hall, 958 S.W.2d 679, 717 (Tenn. 1997) (rejecting the argument that the manner of selecting "death qualified" jurors results in juries that are prone to conviction); State v. Teel, 793 S.W.2d 236, 246 (Tenn. 1990) (rejecting the argument that the process of "death qualifying" prospective jurors produces a jury that is biased in favor of the State on the issue of guilt or innocence and is not fairly representative of the community).

Second, Appellants contend that having the same jury during the guilt and sentencing phases is unconstitutional because it violates the constitutional right to be tried by an impartial jury.  Essentially, Appellants contend that it is impossible for a jury that has convicted a defendant of first-degree murder to be impartial when it decides whether to impose a death sentence on that defendant.

---

[3]While these authorities applied this rule in the context of a motion for separate trials, we see no reason why the rule should be any different in the context of a motion for separate juries.

[4]Initially, we note that a trial court does not have any discretion to grant a motion for separate juries during the guilt and sentencing phases of trial.  Indeed, Tennessee law specifically requires that following a conviction for first degree murder, a "sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt." Tenn. Code Ann. § 39-13-204(a) (1991).

[5]We note that it is well-settled that a criminal defendant's constitutional rights are not violated by excusing prospective jurors for cause when their personal beliefs concerning the death penalty would prevent or substantially impair their performance as a juror in accordance with their instructions and their oath.  See State v. Hutchison, 898 S.W.2d 161, 167 (Tenn. 1994) (citing Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985)).

However, Appellants have failed to cite any authority or anything in the record in support of this proposition. We cannot agree that the mere fact that a jury has convicted a defendant of first degree murder automatically renders that jury incapable of impartially deciding whether to impose a death sentence. This issue has no merit.

## IV. CONSTITUTIONALITY OF THE DEATH PENALTY

Appellants contend that the trial court erred when it failed to declare that Tennessee's death penalty statutes and procedures are unconstitutional. We disagree.

First, Appellants contend that Tennessee's death penalty statutes and procedures are unconstitutional because the jury is required to impose a death sentence if it finds that the aggravating circumstances outweigh the mitigating circumstances and thus, the jury has no discretion when it decides whether to impose a death sentence. [6] This argument has previously been considered and specifically rejected by the Tennessee Supreme Court. See State v. Smith, 857 S.W.2d 1, 22 (Tenn. 1993) (holding that Tennessee's death penalty statutes "do[] not in any way constitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the constitution").

Second, Appellants contend that Tennessee's death penalty statutes and procedures are unconstitutional because imposition of the death penalty is cruel and unusual punishment. This argument has also been considered and specifically rejected by the Tennessee Supreme Court. See State v. Black, 815 S.W.2d 166, 187–91 (Tenn. 1991) (holding that the death penalty is not unconstitutional per se as cruel and unusual punishment).

Third, Appellants contend that Tennessee's death penalty statutes and procedures are unconstitutional because the Tennessee legislature has concluded that juries are incapable of rendering fair and just verdicts. In addition to the fact that this argument makes no mention of either the federal or the state constitutions, this argument is also inaccurate. Appellants' argument ignores the fact that the Tennessee Legislature has expressly and specifically required that the jury impose the sentence in capital cases. See Tenn. Code Ann. § 39-13-204(a) (1991). Contrary to Appellants' assertions, it is clear that in enacting this statutory scheme, the legislature has manifested a belief that juries are capable of rendering fair and just verdicts in capital cases.

Fourth, Appellants contend that Tennessee's death penalty statutes and procedures are unconstitutional because the immediate sentencing of a capital defendant after pronouncement of the verdict does not afford the capital defendant the same rights as other defendants who are sentenced by the trial court during a separate sentencing hearing. Specifically, Appellants contend that this sentencing procedure violates the constitutional right of capital defendants to equal protection. Appellants have cited no authority in support of this proposition and we reject it. Equal protection requires that all persons who are similarly situated must be treated alike. See State ex rel. Stewart v. McWherter, 857 S.W.2d 875, 876 (Tenn. Crim. App. 1992). It is obvious that capital

---

[6]At the time of the homicides Tennessee Code Annotated section 39-13-204 provided, in relevant part, that the jury shall impose a sentence of death if it finds that the State has proven beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances. Tenn. Code Ann. § 39-13-204(g)(1) (1991).

defendants and defendants in all other cases are not similarly situated and thus, principles of equal protection are simply not implicated here.[7]

Fifth, Appellants contend that Tennessee's death penalty statutes and procedures are unconstitutional because the statutes do not narrow the class of death eligible defendants. As support for this proposition, Appellants cite State v. Middlebrooks, in which the Tennessee Supreme Court held that when a defendant is convicted of first-degree murder solely on the basis of felony-murder, the felony-murder aggravating circumstance does not narrow the class of death eligible murderers sufficiently to satisfy the federal and state constitutions. 840 S.W.2d 317, 346 (Tenn. 1992). However, in this case, Appellants were charged and convicted of deliberate and premeditated first degree murder, not felony murder. Further, the State sought imposition of the death penalty based on Appellants' prior convictions for felonies involving violence to the person and not on the felony murder aggravating circumstance. Thus, Middlebrooks is inapplicable to this case.

Finally, Appellants contend that Tennessee's death penalty statutes and procedures provide for constitutionally inadequate appellate review because the statutes do not require the jury to issue a finding as to what mitigating circumstances were found and why the aggravating circumstances outweighed the mitigating circumstances. This argument has previously been considered and specifically rejected by the Tennessee Supreme Court. See State v. Brimmer, 876 S.W.2d 75, 87 (Tenn. 1994) (rejecting the argument that there is no meaningful appellate review of death sentences because there is no requirement for written findings concerning mitigating circumstances). This issue has no merit.

## V. VENUE

Appellants contend that the trial court erred when it denied their request for a change of venue. We disagree.

"In all criminal prosecutions the venue may be changed upon motion of the defendant . . . if it appears to the court that, due to undue excitement against the defendant in the county where the offense was committed or any other cause, a fair trial probably could not be had." Tenn. R. Crim. P. 21(a). However, "[t]he mere fact that jurors have been exposed to pre-trial publicity will not warrant a change of venue." State v. Mann, 959 S.W.2d 503, 532 (Tenn. 1997). "The matter of change of venue addresses itself to the sound discretion of the trial court, and a denial of a change of venue will only be reversed on appeal for an affirmative and clear abuse of discretion." State v. Vann, 976 S.W.2d 93, 114 (Tenn. 1998). In addition, "[b]efore an accused is entitled to a reversal of his conviction on the ground that the trial judge erroneously denied his motion for a change of venue, he must demonstrate . . . that the jurors who actually sat were biased and/or prejudiced." Mann, 959 S.W.2d at 532 (citation and internal quotations omitted).

---

[7]We note that even if we were to find that principles of equal protection were applicable, we would still find that requiring capital defendants to be sentenced immediately by a jury does not violate the right to equal protection. When no suspect class and no fundamental right is involved, a classification by the State is valid if some reasonable basis can be found for the classification, or if any state of facts may reasonably be conceived to justify it. See State v. Tester, 879 S.W.2d 823, 828–29 (Tenn. 1994). Capital defendants are not a suspect class for equal protection analysis and there is no fundamental right to be sentenced by a judge in a separate sentencing hearing. In addition, requiring capital defendants to be sentenced immediately by a jury is neither arbitrary nor unreasonable. Thus, the sentencing procedure for capital defendants does not violate the right to equal protection.

On January 6, 1996, Appellants filed a motion for change of venue in which they referred to an article in that day's edition of the Daily Times.[8] Although the trial court's order of January 31, 1996, which denied the motion states that the court heard testimony from witnesses and argument from counsel, the record does not contain a transcript of this hearing. However, the record does contain two volumes of excerpts from the voir dire that was conducted in this case. A review of these excerpts indicates that the trial court carefully and meticulously orchestrated the jury selection process to ensure the selection of an impartial jury. The trial court conducted individual voir dire of the potential jurors in order to determine whether they had heard anything about the facts of this case and the Connie Branam case that would interfere with their impartiality. The trial court then gave counsel for the State and the defense the opportunity to ask further questions. The trial court then excused any potential jurors who indicated that they would have difficulty being impartial.

In this case, Appellants have failed to specifically identify any pretrial publicity that would suggest that there was any "undue excitement against [them]" in Blount County or any other reason why a fair trial could not be had in Blount County. Moreover, Appellants have failed to identify a single juror who was allegedly biasedl. Quite simply, Appellants have failed to meet their burden of showing that any of the jurors who sat during trial were actually biased or prejudiced against them. This issue has no merit.

## VI. VOIR DIRE

Appellants contend that the trial court erred when it limited the amount of questions that could be asked during voir dire. We disagree.[9]

"The ultimate goal of voir dire is to insure that jurors are competent, unbiased and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994).

The record indicates that after five and one half days of voir dire, the trial court decided that the process was taking too long. The trial court therefore decided that it would conduct the individual voir dire of the potential jurors and it would then give counsel for the State and the defense the opportunity to question the potential jurors about any ambiguous answers. The trial court then conducted individual voir dire and defense counsel was allowed to question the potential jurors about pretrial publicity and about their views on the death penalty.

Appellants' only allegation as to how they were prejudiced by the trial court's method of conducting voir dire is the vague statement that "they could not get a feel of the true feeling of the jurors concerning the death penalty." Indeed, Appellants have failed to indicate anything they could or would have done differently if the trial court had conducted voir dire differently. In addition, Appellants have failed to identify a single instance in which they were prevented from asking questions of a potential juror. Further, Appellants have not even argued that any of the jurors who were actually selected through this method of voir dire were biased or prejudiced. Indeed, the partial excerpts that are contained in the record indicate that the trial court excused jurors who indicated that they would be unable to be impartial. Under these circumstances, we conclude that the trial court

---

[8] This article is not in the record.

[9] Initially, we note that because the record only contains parts of the voir dire, our review is limited.

did not abuse its discretion when it conducted voir dire in the manner that it did. This issue has no merit.

### VII. JURY SELECTION EXPERT

Appellants contend that the trial court erred when it revoked its authorization for funds to pay for a jury selection expert. We find no error here.

The record indicates that on March 7, 1994, the trial court granted Appellants' request for funds to pay for a jury selection expert. Appellants then had the assistance of jury selection expert Margie Fargo during the initial jury selection that began on January 22, 1996. Although it is not clear from the record, the trial court apparently did not empanel this jury because the jury pool was too small. Subsequently, during an ex parte hearing on June 18, 1996, the trial court revoked its authorization of funds to pay for a jury selection expert. The trial court reasoned that because defense counsel had spent approximately one and one-half weeks working with Fargo during the first jury selection process, defense counsel had acquired the knowledge that was necessary to effectively select a jury. Thus, the trial court ruled that continued employment of a jury selection expert was not necessary to ensure that Appellants received a fair trial.

During an ex parte hearing on July 29, 1996, Appellants asked the trial court to reconsider its denial of funds for a jury selection expert. Appellants argued that a jury selection expert was necessary in every capital case and in addition, a jury selection expert was needed in this case because defense counsel had never selected a "death qualified" jury before. The trial court ruled that Appellants' right to a fair trial would not be violated by discontinuing the jury selection expert services. The trial court stated that because defense counsel had already been instructed by Fargo about how to select a jury and because three of the defense attorneys had over twenty years of almost exclusive trial experience, defense counsel would be able to competently select a jury. In addition, the trial court noted that Appellants had a right to have a jury that would apply the law fairly and impartially, but Appellants did not have the right to have a jury that would never impose a death sentence.

Tennessee Code Annotated section 40-14-207 provides, in relevant part, that when a capital defendant has been found to be indigent, the trial court "may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected." Tenn. Code Ann. § 40-14-207(b) (1990). "Absent an abuse of discretion, the trial court's ruling on the necessity for an expert will be upheld." Ruff v. State, 978 S.W.2d 95, 101 (Tenn. 1998). In addition, the Tennessee Supreme Court has expressly stated that a trial court may deny a defendant the assistance of a jury selection expert when the defendant has failed to demonstrate a particularized need for the expert services. Mann, 959 S.W.2d at 526; Black, 815 S.W.2d at 180.

In this case, Appellants have failed to establish that they had a "particularized need" for the continued use of the jury selection expert. Essentially, Appellants argue that because none of the defense attorneys had ever selected a "death qualified" jury before, they were incapable of effectively

selecting a jury in this case without continued employment of the jury selection expert.[10] The mere fact that defense counsel had never selected a jury in a capital case before, standing alone, is insufficient to establish a "particularized need" for the continued services of a jury selection expert in this case. Indeed, as noted by the trial court, two of the defense attorneys had worked closely with Fargo for one and one half weeks during the previous jury selection process.[11] Further, defense counsel stated at the hearing that Fargo had already collected information from Appellants and defense counsel and had prepared two pages of questions for defense counsel to ask the potential jurors. Under these circumstances, we conclude that the trial court did not abuse its discretion when it revoked the funds for continued employment of Fargo. This issue is without merit.[12]

## VIII. INTELLIGENCE QUOTIENT TESTING

Appellants contend that the trial court erred when it failed to order that an intelligence quotient ("IQ") test be administered to Appellants while they were under the influence of alcohol. We disagree.

On July 27, 1995, Appellants filed a motion asking the court to order that they be tested for IQ while they were under the influence of alcohol. At the hearing on the motion on January 30, 1996, Appellants argued that their consumption of alcohol shortly before the time that Griffin was killed may have lowered their IQ level below 70, which would have rendered them statutorily ineligible for the death penalty.[13] However, Appellants argue on appeal that their IQ level while they were intoxicated was relevant to the elements of intent and premeditation.

Dr. Peter Young testified for the defense that according to the results of IQ testing, Dellinger had an IQ level of 72 in March of 1995 and Sutton had an IQ level of 76 in November of 1993. Dr. Young then opined that Appellants' use of alcohol could have reduced their IQ level to below 70 at the time that Griffin was killed. On cross-examination, Dr. Young admitted that the authorities upon which he based his opinion actually contradicted his opinion. Dr. Young also admitted that there was no recognized statistical data that could be used to adjust Appellants' IQ levels while they were functioning in an intoxicated state.

---

[10]Appellants also contend that they were entitled to a jury selection expert because a jury selection expert is necessary for an effective defense in every capital case. However, this conclusory statement is insufficient to establish a "particularized need" for a jury selection expert in this case.

[11]The record indicates that Fargo was paid $11,120.00 for these services.

[12]We note that in the argument for this issue, Appellants also make the conclusory allegations that the revocation of funds for continued employment of Fargo violated: their right to due process, their right to equal protection, their right to effective assistance of counsel, and their right to compulsory process of witnesses. However, Appellants have failed to support these allegations with any argument other than vague citations to authorities that stand for the general proposition that criminal defendants have constitutional rights to due process, equal protection, effective assistance of counsel, and compulsory process. Thus, Appellants have waived these arguments. Tenn. Ct. Crim. App. R. 10(b).

[13]Tennessee Code Annotated section 39-13-203 prohibits imposition of a death sentence on any defendant who, at the time of the offense, had an IQ level of 70 or less, had deficits in adaptive behavior, and had mental retardation manifested during the developmental period or by age eighteen. Tenn. Code Ann. § 39-13-203(a)–(b) (1991).

-16-

Dr. Eugene Cord testified for the State that the results of an IQ test would be invalid if the test had been given to an intoxicated person. Dr. Cord also testified that while intoxication would impair performance, it would not affect IQ level. Dr. Cord testified that he was unaware of any statistical data that could be used to adjust an individual's IQ level while in an intoxicated state.

At the conclusion of the hearing, the trial court found that there was no proof that alcohol use had any effect on IQ level. The trial court also found that it would be useless to test Appellants for IQ level while they were intoxicated because there was no recognized test for doing so. Moreover, the trial court found that Appellants had also failed to prove that they had deficits in adaptive behavior or that they had mental retardation that was manifested during the developmental period or by age eighteen.

We conclude that the evidence in the record does not preponderate against the trial court's findings that alcohol use does not effect IQ level and that there is no recognized test for determining the IQ level of an intoxicated person. Thus, testing Appellants for IQ level while they were intoxicated would have been an exercise in futility. In addition, the trial court's refusal to order the IQ tests did not prevent Appellants from showing that they did not have the required mental state for first degree murder because they were intoxicated at the time of the offense. Indeed, there was a great deal of evidence that Appellants had been drinking shortly before Griffin was killed and the trial court instructed the jury that "[i]f you find that [Appellants] were intoxicated to the extent that they could not have possessed the required culpable mental state, then they cannot be guilty of the offense charged." In short, the trial court did not err when it refused to order that Appellants be tested for IQ levels while they were intoxicated. This issue has no merit.

## IX. ADMISSION OF EVIDENCE SEIZED PURSUANT TO A SEARCH WARRANT

Appellant Dellinger contends that the trial court erred when it failed to suppress evidence that was seized from his residence and the surrounding area pursuant to a search warrant.

On February 28, 1992, Detective Widener obtained a search warrant for Dellinger's residence, outbuildings, and land. Later that same day, Widener and some other officers searched Dellinger's property. During the search, the officers discovered and seized numerous shotgun shells, several shells form other weapons, a .303 rifle, and a Mossberg shotgun barrel. Dellinger contends that these items were inadmissible evidence because the search of his property was invalid under the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution.[14]

### A. Validity of the Search Warrant on its Face

Dellinger contends that the search warrant is void on its face because the supporting affidavit does not create a nexus between his property and the murder of Griffin. We disagree.

An affidavit which establishes probable cause is an indispensable prerequisite to the issuance of a search warrant. See Tenn. Code. Ann. § 40-6-103 (1997); Tenn. R. Crim. P. 41(c). "An

---

[14]The United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Tennessee Constitution similarly provides "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ." Tenn. Const. art I, § 7.

affidavit in support of a search warrant must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993). "The nexus between the place to be searched and the items to be seized may be established by the type of crime, the nature of the items, and the normal inferences where a criminal would hide the evidence." Id.

The affidavit provide by Detective Widener in support of the search warrant in this case provides:

> Affiant . . . has good ground and belief, and does believe that James A. Dellinger is in possession of . . . [o]ne 12 gauge shotgun, make and model unknown, and 12 gauge "00" shotgun shells, Remington Peters Brand.
>
> . . . .
>
> [A]ffiant has information to show that at approximately 7:11 p.m., 21 February 1992, Tommy Griffin was involved in a fight with James Dellinger and Gary Sutton. Tommy Griffin was arrested at Blount County and booked at approximately 7:35 p.m. At approximately 9:30 p.m. this same night, Tommy Griffin's mobile home located in the same proximity as that of James Dellinger's home burned to the ground. At 11:25 p.m. this night of 21 February 1992, at the Blount County Jail, James Dellinger and Gary Sutton showed up and made bail for Tommy Griffin, who was last seen alive leaving the Blount County Jail at 11:25 p.m. on 21 February 1992, with Dellinger and Sutton. Affiant has further information to show that at 11:55 p.m. Tommy Griffin was shot dead with a 12 gauge shotgun; one blast striking him in the back of the head—that blast being "00" buckshot; and two spent 12 gauge "00" buckshot hulls, Remington Peters Brand, were found near the body.

We conclude that this affidavit is sufficient on its face to establish that there was probable cause to believe that the twelve gauge shotgun that was used to kill Griffin, as well as some shotgun shells, would be found at Dellinger's residence. The affidavit states that Dellinger had been in an altercation with Griffin a few hours before Griffin was killed, that Griffin was last seen alive when Dellinger bailed him out of jail thirty minutes before he was killed, and that Griffin was killed by a shot from a twelve gauge shotgun. This information establishes probable cause to believe that Dellinger participated in the murder of Griffin.[15] In addition, it is reasonable to conclude that a shotgun is an item that would be kept at the owner's residence. Indeed, as noted by the Tennessee Supreme Court in Smith,

> Where the object of the search is a weapon used in the crime or clothing worn at the time of the crime, the inference that the items are at the offender's residence is especially compelling, at least in those cases where the perpetrator is unaware that the victim has been able to identify him to the police. Other instrumentalities are also likely to be in the offender's home, especially when there is reason to believe he would make use of them there.

868 S.W.2d at 572. Thus, we conclude that the affidavit does establish a nexus between Dellinger's property and the items sought pursuant to the warrant. This issue has no merit.

---

[15]We note that "[o]nly the probability and not a prima facie showing of criminal activity is the standard of probable cause." State v. Dowell, 705 S.W.2d 138, 140 (Tenn. Crim. App. 1985).

-18-

## B. Truthfulness of the Affidavit

Dellinger contends that the search warrant is invalid because it contains false statements and misrepresentations. Specifically, Dellinger contends that the statement in the affidavit that "at approximately 7:11 p.m., 21 February 1992, Tommy Griffin was involved in a fight with James Dellinger and Gary Sutton" is false and misleading. We disagree.

The Tennessee Supreme Court has set forth two circumstances which authorize impeachment of a facially valid search warrant affidavit: (1) when "a false statement [is] made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) [when] a false statement, essential to the establishment of probable cause, [is] recklessly made." State v. Little, 560 S.W.2d 403, 407 (Tenn. 1978). The trial court concluded that neither of these circumstances was present and rather, the statements in the affidavit were merely reasonable conclusions based on information that Officer Widener possessed at the time. We agree with the trial court.

During the hearing on this issue, Widener testified that he had not seen the altercation between Appellants and Griffin and that none of the witnesses who had seen the altercation could identify Appellants. However, Widener testified that he had received statements from the bartenders at Howie's Hideaway in which they stated that Appellants and Griffin had left the bar in a dark Camaro at approximately 7:00 p.m. Widener also testified that he had statements from Mr. and Mrs. Walker in which they stated that they had seen a fight while they were on the Alcoa Highway at 7:10 p.m. in which they saw two men attempting to pull a third man out of a dark-colored Camaro. Widener further testified that he had statements from Mr. and Mrs. Davis in which they related how they had seen a shirtless man staggering around by the Alcoa Highway sometime after 7:00 p.m. and they had subsequently seen a dark-colored Camaro and a man who appeared to looking for something in the same area. Widener also testified that he had received statements from Alcoa police officers in which they related that they had found Griffin in this area at approximately 7:15 p.m. and that Griffin was bruised and he told them that he had been in a fight with some friends.

We agree with the trial court that Widener's statement in the affidavit that he had received information that Griffin was involved in a fight with Appellants at approximately 7:11 p.m., on February 21, 1992, was not a false statement that was made with intent to deceive the court or a false statement that was made recklessly. Rather, as the trial court stated, it was merely a reasonable conclusion based on the information that Widener had at the time. This issue has no merit.[16]

## C. Compliance with Rule 41(c) of the Tennessee Rules of Criminal Procedure

---

[16]Dellinger also contends that Widener's affidavit contains false statements about the source of the information that prevented the magistrate from judging the credibility of the source. Despite Dellinger's contention, it is clear that Widener made no representation that he had personally observed any of the events listed in the affidavit. In addition, it is clear that the information contained in the affidavit, by its very nature, is information that was provided either by other police officers or by citizen witnesses and not from a criminal informant or tipster from "the criminal milieu." Thus, the information is presumed to be reliable. See State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999) (citing State v. Melson, 638 S.W.2d 342, 354 (Tenn. 1982)).

Dellinger contends that the search warrant is invalid because execution of the warrant failed to comply with Rule 41(c) of the Tennessee Rules of Criminal Procedure. We disagree.

> Rule 41(c) provides:
> A warrant shall issue only on an affidavit or affidavits sworn to before the magistrate and establishing the grounds of issuing the warrant. . . . The magistrate shall prepare an original and two exact copies of the search warrant, one of which shall be kept by the magistrate as a part of his or her official records, and one of which shall be left with person or persons on whom the search warrant is served. . . . Failure . . . of the serving officer where possible to leave a copy with the person or persons on whom the search warrant is being served, shall make any search conducted under said search warrant an illegal search and any seizure thereunder an illegal seizure.

Tenn. R. Crim. P. 41(c).

First, Dellinger contends that the search of his property was invalid because Widener failed to leave a copy of the warrant with the person on whom it was served. Although Linda Dellinger, who was at home during the execution of the warrant, denied that Widener had left a copy of the warrant with her, Widener expressly testified that he did leave a copy of the warrant with her. Although the trial court made no express finding on this issue, the trial court's ruling upholding the validity of the search necessarily implies that the court found that Widener did leave a copy of the warrant with Linda Dellinger. The record does not preponderate against that finding.

Second, Dellinger contends that the search of his property was invalid because Widener failed to note on the officer's return that he had left a copy of the warrant with Linda Dellinger. However, nothing in Rule 41(c) requires this; the rule only requires that a copy of the warrant be left with the person on whom it was served.

Third, Dellinger contends that the search of his property was invalid because the warrant does not indicate the time at which it was issued. However, the warrant expressly states that it was issued at 2:25 p.m. on February 28, 1992, by Judge Charles S. Sexton. This issue has no merit.

### D. Compliance with Tennessee Code Annotated Section 40-6-104

Dellinger contends that the search warrant is invalid because the supporting affidavit does not comply with the requirements of Tennessee Code Annotated section 40-6-104. We disagree. Tennessee Code Annotated section 40-6-104 states that

> The magistrate, before issuing the warrant, shall examine on oath the complainant and any witness he may produce, and take their affidavits in writing, and cause them to be subscribed by the persons making them. The affidavits must set forth facts tending to establish the grounds of the application, or probable cause for believing that they exist.

Tenn. Code Ann. § 40-6-104 (1990). Dellinger contends that the affidavit supporting the warrant is invalid because it contains no indication that it was subscribed and sworn before the warrant was issued. Although the affidavit does not indicate what it time it was subscribed and sworn to, the

affidavit states that it was "[s]worn and subscribed before [Judge Charles S. Sexton] this 28 day of February, 1992." In addition, the warrant expressly states that "[p]roof by [a]ffidavit having been made before [Judge Charles S. Sexton] by Detective Jim Widener." This clearly indicates that the affidavit was subscribed and sworn to before the warrant was issued. This issue has no merit.

### E. Execution of the Warrant in Sevier County by Officers from Blount County

Dellinger contends that even if the search warrant was valid, the search of his property in Sevier County was illegal because it was conducted by officers from Blount County. We disagree.

Detective Widener of the Blount County Sheriff's Department testified that when he executed the search warrant for Dellinger's property, he was accompanied by Captain McMahan of the Sevier County Sheriff's Department and approximately three other officers from the Sevier County Sheriff's Department. Widener also testified that he witnessed Dellinger's step-daughter, Angela Gray, give consent to search the trailer in which she resided on Dellinger's property.

Dellinger contends that because Rule 41(c) of the Tennessee Rules of Criminal Procedure requires that a search warrant be "directed to and served by the sheriff or any deputy sheriff of the county wherein issued, any constable, or any other peace officer with authority in the county," Widener had no authority as a Blount County officer to execute a warrant in Sevier County. However, in Smith,, the Tennessee Supreme Court upheld a search that was conducted in Robertson County by a Metropolitan Nashville police officer who was accompanied by an officer from the Robertson County Sheriff's Department. 868 S.W.2d at 572-73. The supreme court stated that the Metropolitan Nashville police officer's "participation in procuring the warrant and executing it d[id] not invalidate the warrant." Id. at 573. In addition, the Tennessee Supreme Court held in State v. Pigford, 572 S.W.2d 921 (Tenn. 1978), that the issuance of a warrant to a federal officer and the participation of the federal officer in the execution of the warrant did not invalidate the warrant so long as it met all statutory requirements. Id. at 922. Thus, we conclude that because Widener was accompanied by Captain McMahan when he executed the warrant for Dellinger's property and the warrant met all statutory requirements, the execution of the search warrant was valid.[17]

Dellinger also contends that Gray's consent to search the trailer in which she was living was invalid merely because it was given to an officer from the Blount County Sheriff's Department. Dellinger has cited no authority for this proposition, and we conclude that the fact that the consent was given to officers from Blount County is completely irrelevant in this case. This issue has no merit.

### F. The Items Seized in the Search

---

[17]Dellinger also challenges the manner in which the warrant was returned to the issuing magistrate. However, as previously noted by this Court, "[an] improper return cannot negate the validity of an otherwise legal search." State v. Robinson, 622 S.W.2d 62, 75 (Tenn. Crim. App. 1980).

Dellinger contends that because the warrant only authorized a search for a twelve gauge shotgun and Remington Peters Brand twelve gauge "00" shotgun shells, the seizure of all other brands of shotgun shells was invalid.[18] We disagree.

As this Court has previously stated, "[t]here is no prohibition against the seizure of other property not specifically mentioned in a valid search warrant, if such is relevant to the crimes suggested by the warrant." State v. Wright, 618 S.W.2d 310, 318 (Tenn. Crim. App. 1981); see Vermilye v. State, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979). Because Griffin was killed by a shot from a twelve gauge shotgun, it is obvious that all twelve gauge shotgun shells and hulls were relevant to the crime, no matter what brand they were. Thus, the officers properly seized the shells and hulls. This issue has no merit.

## X. EVIDENCE OF OTHER CRIMES

Appellants contend that the trial court erred when it admitted evidence about the altercation that occurred on the Alcoa Highway, the burning of Griffin's trailer, and the murder of Branam. Specifically, Appellants contend that this evidence was inadmissible because its only purpose was to show that they had violent character traits and even if it had been relevant to some other purpose, its probative value was outweighed by its prejudicial effect. We disagree.

Under Rule 404(b) of the Tennessee Rules of Evidence:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admission is that the court find by clear and convincing evidence that the defendant committed the other crime. Tenn. R. Evid. 404 (Advisory Commission Comments); State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997); State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985). When a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion.

---

[18]We note that in the argument section for this subissue, Dellinger does not specifically challenge the admissibility of any other evidence seized during the search. Thus, we do not address the propriety of the seizure of the other items that were not expressly identified in the warrant.

DuBose, 953 S.W.2d at 652. Where a court fails to substantially comply with these requirements, the court's decision is afforded no deference. Id.[19]

### A. The Altercation on the Alcoa Highway and the Burning of Griffin's Trailer

The trial court ruled that evidence about the altercation on the Alcoa Highway and the burning of Griffin's trailer was relevant to establishing the sequence of events on the night of Griffin's murder. In addition, the trial court also found that the probative value of this evidence was not outweighed by danger of unfair prejudice.

We conclude that the trial court did not abuse its discretion when it ruled that this evidence was admissible. The evidence that showed that Appellants were involved in an altercation with Griffin and that they set fire to Griffin's trailer on the night that he was killed was relevant to establishing Appellants' intent and motive for killing Griffin. Indeed, the Tennessee Supreme Court has previously recognized that evidence of prior acts of violence against the victim are admissible under Rule 404(b) because the evidence is relevant to show the defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim. State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993). Moreover, the evidence that tied Appellants to the other crimes against Griffin that were committed just hours before Griffin was killed was also relevant to establishing the identity of Griffin's killers. Indeed, Rule 404(b) provides for the admissibility of evidence about other crimes when relevant to issues of identity, intent, and motive. See Tenn. R. Evid. 404(b) (Sentencing Commission Comments). We also conclude that the probative value of this evidence was not outweighed by danger of unfair prejudice. This issue has no merit.

### B. The Connie Branam Murder

The trial court ruled that the State could introduce evidence about the murder of Branam, but the State could not introduce the fact that Appellants had been convicted of the Branam murder. The trial court found that the evidence about the Branam murder was admissible because it was relevant to establishing the identity of Griffin's killers.

We conclude that the trial court did not abuse its discretion when it ruled that this evidence was admissible. The evidence regarding the Branam murder showed that when Appellants went to Howie's Hideaway with Branam the day after Griffin was killed, they acted suspiciously by repeatedly questioning the barmaids about whether they remembered seeing them with Griffin on the previous day and by attempting to fabricate a story about drinking at the bar with Griffin after

---

[19]Although it is not clear, Appellants apparently do not challenge the trial court's compliance with the procedural aspects of Rule 404(b) and instead, they only challenge the trial court's conclusion that the evidence was relevant to issues other than Appellants' characters and that the probative value of the evidence was not outweighed by danger of unfair prejudice. Thus, we do not address the trial court's compliance with Rule 404(b)'s procedural requirements. Indeed, although the record indicates that the trial court conducted a hearing on this issue, the record only contains a brief excerpt of the hearing. Therefore, we would be precluded from reviewing the trial court's compliance with the procedural requirements even if Appellants had challenged it. It is the duty of the party seeking appellate review to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues raised by the party. State v. Ballard, 855 S.W.2d 557, 560–61 (Tenn. 1993); State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). When the record is incomplete, and does not contain a transcript of the proceedings relevant to an issue presented for review, this Court is precluded from considering the issue. State v. Matthews, 805 S.W.2d 776, 784 (Tenn. Crim. App. 1990).

he had been released from jail. In addition, the evidence showed that when Newman told Appellants that she remembered them from the day before, Sutton attempted to convince Newman to come with them. When Newman refused, Sutton threatened her. This evidence suggests that Appellants had the intent to silence any witness who could connect them with Griffin's murder. Thus, the evidence of Branam's murder was highly relevant to establishing the identity of Griffin's killers because it tended to show that Appellants had killed Branam in order to conceal the fact that they had murdered Griffin. In addition, we conclude that the highly probative value of this evidence was not outweighed by the danger of unfair prejudice. Under these circumstances, we cannot say that the trial court abused its discretion when it admitted this evidence. This issue has no merit.[20]

## XI. ADMISSION OF A RIFLE AND SHELLS INTO EVIDENCE

Appellant Sutton contends that the trial court erred when it admitted the .303 rifle and the .303 shells that were found at Dellinger's residence into evidence. Specifically, Sutton contends that this evidence was inadmissible because it was not relevant to any issue in the case. We disagree.

As this Court has previously stated, the determination of whether evidence is relevant is within the sound discretion of the trial court. State v. Griffis, 964 S.W.2d 577, 594 (Tenn. Crim. App. 1997). In this case, investigators testified that a .303 rifle shell had been found in the burned car that contained Branam's body. In addition, Carmen testified that he had determined that this rifle shell was fired from the .303 rifle that was found in Dellinger's residence. This evidence helped connect Appellants to the Branam murder and as we have previously stated, evidence regarding the Branam murder was very relevant to establishing the identity of Griffin's killers. Thus, we conclude that the trial court did not abuse its discretion when it admitted this evidence. This issue has no merit.

## XII. ADMISSION OF GRIFFIN'S STATEMENTS INTO EVIDENCE

Appellants contend that the trial court erred when it allowed the State to introduce the statements that Griffin made to Officer Roberts concerning the incidents on the Alcoa Highway. Specifically, Appellants contend that Griffin's statements were inadmissible hearsay. We disagree.

Rule 803 of the Tennessee Rules of Evidence provides, in relevant part,
The following are not excluded by the hearsay rule:

---

[20] Appellants also contend that evidence about Branam's murder was inadmissible because the State failed to prove that the body that was found in the burned vehicle was that of Branam. However, Dr. Bass testified that the body had been identified as that of Branam by use of dental records. Although Appellants now claim that Dr. Bass's identification of the body was improper, the record indicates that Appellants did not object to Dr. Bass's testimony or otherwise contest his identification of the body. Thus, they have waived any objection to the identification of Branam's body by Dr. Bass. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

(2) Excited Utterance.  A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Tenn. R. Evid. 803(2).  The Tennessee Supreme Court has stated that in order for a statement to be admissible under this rule, (1) there must be a startling event or condition, (2) the statement must relate to the startling event or condition, and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition.  State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997).  In addition, "[i]t is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion."  State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996).

During the hearing on this issue, Officer Roberts testified that on the night of February 21, 1992, he received a report of a possible fight involving individuals in a black Camaro with one headlight.  When Roberts arrived at the scene approximately two minutes later, he found Griffin sitting in the bed of a pickup truck.  Upon viewing Griffin, Roberts concluded that Griffin had been in a fight because he was not wearing a shirt, he had scratches on his upper body, and he had a cut behind his left ear.  Roberts testified that when he asked Griffin what had happened, Griffin stated that he had been in an argument with some friends and they had put him out of a car.  Roberts testified that at this time, Griffin's voice was shaky, his lip was quivering, and he appeared to be scared.  When Roberts asked for further information, Griffin said, "I just can't tell you man," and he looked like he was going to cry.  Griffin also looked around as if he was looking for someone.

We conclude that the trial court did not abuse its discretion when it admitted Griffin's statements under Rule 803(2).  First, it is clear that the altercation during which Griffin sustained scratches and a cut qualifies as a startling event under the rule.  As noted by the supreme court, "the possibilities are endless because any event deemed startling is sufficient."  Gordon, 952 S.W.2d at 820 (citation and internal quotations omitted).  Second, Griffin's statements all related to the altercation.  As noted by the supreme court, "considerable leeway is available, because the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition."  Id. (citation and internal quotations omitted).  Third, Griffin made his statements while he was still under the stress or excitement of the altercation.  For this third requirement, "[t]he ultimate test is spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication."  Id. (citation omitted).  In this case, Roberts testified that he responded to the scene within two minutes of receiving the call and that when he talked to Griffin,  Griffin's voice was shaky, his lip was quivering, and he appeared to be scared and ready to cry.  Thus, the evidence shows that Griffin was still under the stress or excitement of the altercation when he made his statements.[21]  This issue has no merit.

---

[21]Appellants contend that because Griffin's statements were given in response to Roberts' questions, the statements were not spontaneous and thus, were not made while under stress or excitement.  However, the Tennessee Supreme Court stated in Gordon that "statements made in response to questions may still be admissible if the declarant is under the excitement or stress of the event."  952 S.W.2d at 820–21.

## XIII. ADMISSION OF THE TRANSCRIPT OF SUTTON'S PRETRIAL STATEMENT INTO EVIDENCE

Appellant Sutton contends that the trial court erred when it allowed the State to introduce a transcript of his pretrial statement into evidence. We disagree.

Initially, we note once again that "[i]t is well established that trial courts have broad discretion in determining the admissibility of evidence, and their rulings will not be reversed absent an abuse of that discretion." McLeod, 937 S.W.2d at 871.

Detective Widener testified that he had interviewed Sutton at the Sevier County Sheriff's Department on February 25, 1992. Widener also testified that this interview had been electronically recorded. The State then introduced the audiotape of the interview and began playing the tape for the jury. After a few minutes, the trial court stopped the tape and asked the jurors whether they could understand the tape. The jurors indicated that they could not.

During a subsequent jury out hearing, Widener testified that he was present when Sutton gave his statement, that he had heard Sutton's words, that he had previously listened to the tape and verified that the transcript of the tape was accurate. Widener testified that he had listened to the tape when it was in "better shape" than it was at trial and he had compared it to the transcript several times. Widener acknowledged that there were many instances in which the transcript indicated that a part of the tape was "unintelligible." The trial court subsequently allowed the State to introduce the transcript into evidence.

Sutton essentially argues that the transcript should not have been admitted because it was not accurate. This argument ignores the testimony of Widener that he heard Sutton give the statement, that he had reviewed the tape, that he had reviewed the transcript, and that he had determined that the transcript was accurate. The fact that the transcript contains numerous indications that a part of the tape was "unintelligible" does not mean that the transcript was inaccurate. Thus, we conclude that the trial court did not abuse its discretion when it admitted this evidence. This issue has no merit.

## XIV. ADMISSION OF MISSING PERSON REPORTS INTO EVIDENCE

Appellants contend that the trial court erred when it allowed the State to introduce the two missing persons reports filed by Viola Griffin in which she stated that she had not seen or heard from Griffin since February 21, 1992, at 11:45 p.m. and she had not seen or heard from Branam since February 22, 1992, at 1:00 p.m. We conclude that Appellants have waived this issue.

The record indicates that when the State sought to introduce the reports during rebuttal, Appellant Sutton objected on the ground that the reports were not proper rebuttal evidence. After a bench conference, Sutton objected again on the ground that the reports were irrelevant and immaterial. The trial court overruled the objection.

On appeal, Appellants have abandoned the argument that the reports were improper rebuttal evidence. Thus, we do not address it. Instead, Appellants argue for the first time on appeal that the reports were inadmissible hearsay evidence.[22] "It is elementary that a party may not take one position regarding an issue in the trial court, change his strategy or position in mid-stream, and advocate a

---

[22]The record indicates that although Appellants made one vague reference to hearsay during the bench conference, that was clearly not the basis of their objection to this evidence.

different ground or reason in this Court." State v. Dobbins, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988). Thus, this issue is waived.

## XV.  EXPERT TESTIMONY IN REBUTTAL

Appellants contend that the trial court erred when it allowed Dr. Harlan to testify for the State in rebuttal.  We disagree.

The determination of the admissibility of rebuttal evidence lies in the discretion of the trial court and this Court will not interfere with the exercise of this discretion unless there has been clear abuse of discretion appearing on the face of the record.  State v. Kendricks, 947 S.W.2d 875, 884 (Tenn. Crim. App. 1996).

The record indicates that when the State attempted to call Dr. Cleland Blake, Appellants objected and the trial court conducted a jury out hearing.  Although the record indicates that the trial court subsequently ruled that Dr. Blake would not be allowed to testify, the transcript of the hearing was not included in the record pursuant to instructions from defense counsel. The State therefore relied on the testimony of Dr. Ellington and Jason McDonald to establish the time of Griffin's death.

As part of the defense proof, Dr. Wolfe opined that Griffin had died between twenty-four and thirty-six hours before his body was discovered on February 24, 1992.  Thereafter, the State called Dr. Harlan in rebuttal and Appellants objected.  The trial court overruled the objection, and Dr. Harlan testified that it was his opinion that Griffin died between 6:00 p.m. on February 21, 1992, and 8:00 a.m. on February 22, 1992. Dr. Harlan also testified that he had reviewed the testimony of Dr. Wolfe and he disagreed with many of the conclusions that Dr. Wolfe had made from viewing the evidence in the case.  The trial court then asked whether Appellants had anything in surrebuttal, and Appellants stated that they did not.

Appellants essentially argue that because Dr. Harlan could have testified during the State's case in chief, he should not have been allowed to testify during rebuttal.  However, this Court has previously stated that "we have observed that it is within the discretion of the trial court to permit the state, in a criminal case, to introduce in rebuttal even testimony which should have been introduced in chief."  Kendricks, 947 S.W.2d at 884 (citation omitted).  It is clear that the State could have called Dr. Harlan during its case in chief.  However, although the record is not entirely clear because defense counsel prevented the relevant hearing from being transcribed into the record, a reading of the record indicates that the State's purpose in calling Dr. Blake was to elicit expert testimony about the time of Griffin's death.  When the trial court ruled that Dr. Blake could not testify, the State decided to rely on what was essentially lay testimony from Ellington and McDonald about the time of death.  Once Appellants proffered the testimony of Dr. Wolfe, it was within the trial court's discretion to allow the State to call its own expert to rebut Wolfe's opinion.[23]

Appellants also contend that it was improper for Dr. Harlan to testify in rebuttal because the State did not disclose Dr. Harlan's identity to Appellants before trial.  However, it is clear that the

---

[23]In support of their argument that Dr. Harlan should not have been allowed to testify during rebuttal because he could have testified during the State's case in chief, Appellants cite State v. West, 825 S.W.2d 695 (Tenn. Crim. App. 1992).  However West is distinguishable from this case because in West, this Court held that the testimony during rebuttal was improperly admitted because the testimony did not rebut anything and thus, it should have been proffered during the State's case in chief.  Id. at 698.  In this case, Dr. Harlan's testimony clearly rebutted the testimony of Dr. Wolfe.

State did not disclose Dr. Harlan's identity before trial because it intended to call Dr. Blake as its expert. In addition, it is well-established that the State's duty to disclose the names of its witnesses is merely directory, not mandatory. State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992). In addition, a defendant will be entitled to relief for nondisclosure only if he or she can demonstrate prejudice, bad faith, or undue advantage. Id. In this case, Appellants claim that they were prejudiced because the fact that Dr. Harlan testified without prior notice prevented them from offering anything in surrebuttal. However, the record indicates that when the trial court asked Appellants whether they had anything in surrebuttal, Appellants neither expressed an intention to offer surrebuttal nor asked for a continuance in order to call other witnesses. Thus, Appellants have waived any claim that they were prevented from calling further witnesses to offer surrebuttal. See Tenn. R. App. P. 36(a). This issue has no merit.

## XVI. SUFFICIENCY OF THE EVIDENCE

Both Appellants contend that the evidence was insufficient to support their convictions for first degree murder because the State failed to establish all of the elements of the offense beyond a reasonable doubt. In addition, Appellant Sutton contends that the evidence was insufficient to support his conviction under the theory that he was criminally responsible for the conduct of Appellant Dellinger.

When an appellant challenges the sufficiency of the evidence, this Court is obliged to review that challenge according to certain well-settled principles. A verdict of guilty by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). Although an accused is originally cloaked with a presumption of innocence, a jury verdict removes this presumption and replaces it with one of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with Appellant to demonstrate the insufficiency of the convicting evidence. Id. On appeal, "the [S]tate is entitled to the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Id. Where the sufficiency of the evidence is contested on appeal, the relevant question for the reviewing court is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In conducting our evaluation of the convicting evidence, this Court is precluded from reweighing or reconsidering the evidence. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996). Moreover, this Court may not substitute its own inferences "for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779. Finally, Rule 13(e) of the Tennessee Rules of Appellate Procedure provides, "findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact beyond a reasonable doubt."

### A. The Elements of First Degree Murder

Appellants contend that the State failed to establish all of the elements of first degree murder beyond a reasonable doubt. We disagree.

When Griffin was killed in 1992, Tennessee's first-degree murder statute provided that "[f]irst degree murder is: [a]n intentional, premeditated and deliberate killing of another." Tenn. Code Ann. § 39-13-202 (1991).[24]

First, Appellants contend that the evidence was insufficient to support their convictions because the State failed to prove that Appellants were the individuals who killed Griffin. However, we conclude that when the evidence is viewed in the light most favorable to the State, as it must be, the evidence was clearly sufficient for a rational jury to find beyond a reasonable doubt that Appellants killed Griffin.

Carr saw Appellants and Griffin come to Howie's Hideaway on February 21, 1992, in a dark blue Camaro or Trans Am. Newman observed Appellants and Griffin when they left Howie's Hideaway at approximately 7:00 p.m. Approximately ten minutes later, Mr. and Mrs. Walker observed an altercation on the Alcoa Highway in which a person standing outside of a dark-colored Camaro with one headlight appeared to be fighting with a person inside the Camaro. That same night, Davis saw a shirtless man stumbling around by the Alcoa Highway and she subsequently saw two men standing by a dark-colored Camaro in the same area who appeared to be looking for something.

When Officer Roberts responded to the call about the altercation on the Alcoa Highway, he found a shirtless Griffin sitting on the bed of a pickup truck. Griffin initially stated that an argument had taken place and that some friends put him out of a car, but when questioned further, he stated that the men were not really his friends. Griffin refused to give any other information and Roberts subsequently arrested Griffin for public intoxication and took him to the Blount County Jail. Sergeant Herron participated in the booking of Griffin into the jail at 7:40 p.m. Approximately forty-five minutes later, Dellinger approached Herron and asked when Griffin could be released. Herron told Dellinger that the victim would be kept a minimum of four hours.

At approximately 9:00 p.m., Henry saw Dellinger's white pickup truck drive up the road from the direction of Griffin's trailer and pull into Dellinger's driveway. A few seconds later, Henry saw flames shooting out of Griffin's trailer. Clabo subsequently investigated the fire and concluded that the fire had been set by human hands using a liquid accelerant.

When Jennifer Branam learned that Griffin's trailer was on fire, she went to Dellinger's trailer and asked Appellants to accompany her to Griffin's trailer. Dellinger then stated that he could not go because he was in enough trouble already. Later that night, Jennifer Branam saw Appellants move an object that looked like a shotgun from Dellinger's truck to Linda Dellinger's car.

Griffin was subsequently released from jail at 11:25 p.m. when Dellinger returned to the jail and posted a cash bond. Shortly thereafter, Lieutenant Defoe saw Appellants leave the jail with an individual who had just been released.

At 11:55 p.m., McDonald heard two or three gunshots coming from the Blue Springs/Blue Hole area near his home. On February 24, 1992, Carter found the body of a man in the Blue Hole area. Hamilton stated that he subsequently located the body and he also found two spent twelve-gauge shotgun shells and two empty beer cans by the body. Agent Carman subsequently determined that shotgun shells found in Dellinger's yard and the surrounding area and the shells found near

_____

[24]A 1995 amendment eliminated deliberation as an element of first-degree murder. See Tenn. Code Ann. § 39-13-202(a)(1) (1997) ("First degree murder is: A premeditated and intentional killing of another.").

Griffin's body had been fired from the same shotgun. Dr. Harlan opined that Griffin died between 6:00 p.m. on February 21, 1992, and 8:00 a.m. on February 22, 1992.

The next day, Appellants went to Howie's Hideaway with Branam. While they were there, Dellinger repeatedly asked Carr and Newman whether they remembered Appellants from the previous day. Sutton subsequently attempted to get Newman to leave with Appellants and when she refused, Sutton threatened her. Appellants and Branam left at 6:30 p.m., and the flames from the vehicle that contained Branam's body were seen at 8:00 p.m. Clabo subsequently concluded that the fire had been set by human hands with the use of an outside ignition source. Carman subsequently determined that the .303 rifle shell recovered from the scene of the burned vehicle was fired from the rifle that was found in Dellinger's home.

It is clear that the above evidence, when viewed in the light most favorable to the State, is sufficient for a rational jury to find beyond a reasonable doubt that Appellants were the individuals who killed Griffin. A rational jury could conclude from this evidence that Appellants fought with Griffin at approximately 7:10 p.m., set fire to Griffin's trailer at approximately 9:00 p.m., and then retrieved a shotgun. A rational jury could also conclude that Griffin was killed at 11:55 p.m., only thirty minutes after he was last seen alive in the presence of Appellants. A rational jury could also conclude that Appellants had murdered Branam in order to cover-up the murder of Griffin. Thus, a rational jury could certainly conclude that because Appellants fought with Griffin five hours before he was killed, that Appellants set fire to Griffin's trailer three hours before he was killed, that Appellants bailed Griffin out of jail and took him with them thirty minutes before he was killed, that the shotgun hulls found near Griffin's body had been fired from the same gun as the hulls found in Dellinger's yard, and that Appellants killed Branam in order to conceal the murder of Griffin, that Appellants were the individuals who killed Griffin.[25]

Appellants also claim that the evidence was insufficient to support their conviction because the State failed to prove that the murder was committed with premeditation and deliberation. Premeditation requires a showing of a previously formed design or intent to kill. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992). Deliberation requires that the offense be committed with cool purpose, free of the passions of the moment. Id. Although premeditation "may be formed in an instant, deliberation requires some period of reflection, during which the mind is 'free from the influence of excitement, or passion.'" State v. Brown, 836 S.W.2d 530, 538 (Tenn. 1992) (citation omitted). While it remains true that no specific length of time is required for the formation of a cool, dispassionate intent to kill, more than a "split-second" of reflection is required in order to satisfy the elements of premeditation and deliberation. Id. at 543.

The elements of premeditation and deliberation are questions for the jury which may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Tennessee courts have delineated several circumstances that may be indicative of premeditation and deliberation, including planning activity prior to the actual killing, State v. Schafer, 973 S.W.2d 269, 273 (Tenn. Crim. App. 1997); facts from which motive may be inferred, Bordis, 905 S.W.2d at 222; the use of

---

[25]Although it is not clear, Appellants apparently claim that the evidence was also insufficient because the State failed to prove that the body found in the Blue Hole area was that of Griffin. We reject this contention because the evidence clearly shows that the State established that the body was that of Griffin.

a deadly weapon upon an unarmed victim, Brown, 836 S.W.2d at 841; and facts about the nature of the killing. Bordis, 905 S.W.2d at 222.

We conclude that the above evidence, when viewed in the light most favorable to the State, was sufficient for a rational jury to conclude beyond a reasonable doubt that Appellants killed Griffin with both premeditation and deliberation. First, there was evidence that Appellants planned the murder of Griffin before they killed him. Indeed, the evidence shows that after fighting with Griffin, Appellants attempted to bail him out of jail. When this attempt failed, Appellants burned down Griffin's trailer and then retrieved a shotgun. Appellants then returned to the jail, successfully obtained Griffin's release, and then killed him thirty minutes later. Second, there was evidence that Appellants had a motive to kill Griffin. For whatever reason, Appellants were angry enough with Griffin to fight with him and then set fire to his residence. Third, there is absolutely no indication that Griffin was armed when he was shot with the shotgun. Fourth, the fact that Griffin was taken to a remote area and was then shot in the back of the head indicates that the killing was done as part of a preconceived design. In short, a rational jury could conclude from these circumstances that Appellants decided to kill Griffin and then reflected on that decision with cool purpose for some period that was at least more than a "split-second" before they shot and killed him. This issue has no merit.

## B. Criminal Responsibility

Sutton contends that the evidence was insufficient to support his conviction because there was no proof that he fired the shot that killed Griffin or that he did anything to assist Dellinger. We disagree.

Tennessee Code Annotated section 39-11-402 states in relevant part that

A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."

Tenn. Code Ann. § 39-11-402(2) (1991). In order to establish that the defendant had the intent required by this subsection, it must be shown "that the defendant in some way associate[d] himself with the venture, act[ed] with knowledge that an offense [wa]s to be committed, and share[d] in the criminal intent of the principal in the first degree." State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (citation and internal quotations omitted). "The defendant must knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." Id. (citation and internal quotations omitted).

The evidence in this case showed that both Appellants were drinking with Griffin in Howie's Hideaway on February 21, 1992. Both Appellants and Griffin subsequently left the establishment in Sutton's Camaro. Ten minutes later, the Walkers observed the altercation on the Alcoa Highway. Two hours later, Henry saw Dellinger's truck driving away from Griffin's burning trailer. When Jennifer Branam then went to Dellinger's trailer to obtain help, Sutton lied to her and stated that Griffin was in Blount County with a woman. Later that night, Jennifer Branam saw both Appellants take an object that looked like a shotgun out of Dellinger's truck and place it in a car. Both Appellants subsequently went to the Blount County Jail and obtained Griffin's release thirty minutes before he was killed. The next day, Appellants and Branam went back to Howie's hideaway. When

Newman stated that she remembered Appellants and Griffin from the previous day, Sutton attempted to get Newman to come with them and when she refused, he threatened her. We conclude that this evidence is clearly sufficient for a rational jury to find beyond a reasonable doubt that, even if Sutton had not fired the shot that killed Griffin, Sutton was criminally responsible for the murder of Griffin by Dellinger because Sutton had aided Dellinger with the intent of promoting or assisting the murder of Griffin. This issue has no merit.[26]

## XVII. FAILURE TO REMOVE A JUROR

Appellants contend that the trial court erred when it failed to remove a juror whose ex-wife had engaged in misconduct. We disagree.

"Whether to remove jurors who become or are found to be unable or disqualified to perform their duties lies in the discretion of the trial court." State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995) (citation and internal quotations omitted).

The record indicates that at the conclusion of the proof and closing arguments in this case, one of the jurors reported that earlier that day he had received a phone call from his ex-wife in which she had stated that "they" would give him $500.00 in return for a not guilty verdict for Sutton. The juror reported the call to a court officer, and the officer told the juror that he would notify the court and he told the juror not to tell any other jurors about the call.

After the juror explained what had happened, the trial court commended him for the way that he had handled the situation. The trial court then asked the juror how the phone call would affect his feelings about serving on the jury and about following the court's instructions. The juror responded, "I already told her, it's not going to change. I'm not going to change what I already decided on. They can take the money and do whatever they want with it. It just made me mad . . . ." After this somewhat ambiguous statement, the trial court asked the juror whether he would be able to vote according to the dictates of his conscience based on the proof and the instructions from the court. The juror responded that he would. After a brief bench conference, the trial court asked the juror whether he had told any other jurors about the phone call and the juror responded that he had not. The trial court then asked the juror again whether the phone call would inhibit his ability to reach a verdict based on the facts and the law. The juror responded that it would not.

Appellants' argument as to why this juror should have been removed is far from clear. However, it appears that their contention is that the juror's statement that the phone call would not "change what I already decided on" demonstrates that the juror was biased against them and that he had a preconceived judgment about the case. This statement could have any number of meanings in the context in which it was given, including an assertion that the phone call would not affect his ability to be impartial. In any case, the trial court clarified the meaning of the statement by asking the juror about whether the phone call would affect his ability to impartially reach a verdict based on the proof and the court's instructions about the law. On two occasions, the juror responded that he would follow the law and apply it to the proof that had been presented. Under these

---

[26]Appellant Sutton also contends that the trial court erred when it failed to grant their motion for judgment of acquittal. A motion for judgment of acquittal requires that the trial court determine the sufficiency of the evidence. Tenn. R. Crim. P. 29(a). For the same reasons we conclude that the evidence was sufficient to support Appellants' convictions, we also conclude that the trial court did not err when it failed to grant the motion for judgment of acquittal.

circumstances, we conclude that the trial court did not abuse its discretion when it failed to remove this juror. This issue has no merit.

## XVIII. FAILURE TO GRANT A MISTRIAL

Appellants contend that the trial court erred when it failed to grant a mistrial after jurors where exposed to evidence indicating that Appellants had already been tried for the Branam murder. We disagree.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This Court will not disturb that decision absent a finding of an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). "Generally, a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (citation omitted).

The record indicates that while Larry Muncy was testifying about the chain of custody of various pieces of evidence, he stated that certain evidence had been turned over to Jenny Noe "during the course of the trial." Defense counsel then objected and moved for a mistrial on the ground that the jurors could assume based on Muncy's use of the word "trial" that Appellants had previously been charged and tried for the murder of Branam. The court overruled the motion.

The record also indicates that the trial court subsequently received a note from an alternate juror in which the juror indicated that he had seen a bag with the words "not admitted in Sevier County trial" sitting on a table. When the trial court questioned the juror about this incident, the juror stated that because he had seen the bag and because Muncy had previously used the word "trial," he assumed that there had already been a trial in Sevier County. The juror then stated that he had mentioned the bag to one other juror, but she had given no response. The trial court then asked the juror whether seeing the bag or hearing the word "trial" would have any influence on his ability to base his verdict on the proof presented in this case and the juror responded, "None whatsoever." Defense counsel renewed the motion for a mistrial and the court overruled it.

Appellants argue that they were entitled to a mistrial based on the authority of State v. Fleece, 925 S.W.2d 558 (Tenn. Crim. App. 1995). In Fleece this Court held that a defendant who was convicted of driving under the influence was entitled to a new trial because the prosecutor had improperly created the inference that the defendant had a previous conviction for driving under the influence by repeatedly questioning the defendant about restrictions on his license while waving the folder from the previous case in front of the jury. Id. at 560–61. The two incidents in this case fall far short of the impermissible conduct of the prosecutor in Fleece. Unlike the intentional conduct by the prosecutor in Fleece, there is no indication that Muncy's use of the word "trial" and the placement of the bag on the table were anything more than inadvertent mistakes. Further, the use

of the word trial and the writing on the bag did not create any inference whatsoever about the verdict in the Sevier County trial.  In fact, when the trial court specifically asked the juror whether anything he had seen or heard had indicated what the outcome of the Sevier County trial had been, the juror responded no.  Under these circumstances, we conclude that the trial court did not abuse its discretion when it ruled that there was no "manifest necessity" for a mistrial in this case.  This issue has no merit.

## XIX.  THE STATE'S CLOSING ARGUMENT DURING THE GUILT PHASE

Appellants contend that the State's closing argument was improper and prejudicial.  We conclude that Appellants have waived this issue.

Initially, we note that the record indicates that Appellant's did not make a single objection to anything that either of the two prosecutors said during their closing arguments.  By failing to make a contemporaneous objection, Appellants waived this issue.  See State v. Farmer, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1995); Tenn. R. App. P. 36(a).  Moreover, Appellants have failed to identify which of the two prosecutors gave the allegedly improper argument and they have failed to identify even a single statement that they claim was improper.  It is not the function of this Court to speculate as to what portions of the arguments Appellants would contend were improper.  By failing to include appropriate citations to the record, Appellants have waived this issue.  Tenn. Ct. Crim. App. R. 10(b).

## XX.  FAILURE TO INSTRUCT ON A LESSER INCLUDED OFFENSE

Appellant Sutton contends that the trial court erred when it failed to instruct the jury on the lesser included offense of facilitation of a felony.  We disagree.

Tennessee Code Annotated section 39-11-403 provides in relevant part that

> A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Tenn. Code Ann. § 39-11-403(a) (1991).  As previously noted, the intent required for criminal responsibility under section 39-11-402(2) is "intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense." Tenn. Code Ann. § 39-11-402(2) (1991).

In State v. Burns, 6 S.W.3d 453 (Tenn.1999) the Tennessee Supreme Court concluded that an offense is a lesser-included offense of another if:

(a) all of its statutory elements are included within the statutory elements of the offense charged;  or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability;  and/or

(2) a less serious harm or risk of harm to the same person, property or public interest;  or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Id. at 466-67. The supreme court thus concluded, and recently reiterated, that facilitation is a lesser-included offense when a defendant is charged with criminal responsibility for the conduct of another. Id. at 470; State v. Fowler, 23 S.W.3d 285, 288 (Tenn. 2000).

"This does not mean, however, that an instruction must be given simply because an offense is a lesser-included offense of another." Fowler, 23 S.W.3d at 288. "First, the trial court must determine whether 'any evidence exists that reasonable minds could accept as to the lesser included offense.'" Id. at 289 (citing Burns, 6 S.W.3d at 469). "Second, the trial court must determine whether the evidence viewed in this light is legally sufficient to support a conviction for the lesser-included offense." Id.

In this case, there is absolutely no evidence in the record from which a rational jury could conclude that Dellinger forced Sutton to participate in the murder against his will. Further, we hold that a rational jury could not conclude from the evidence in the record that Sutton was merely a bystander during the murder of Griffin. The State's theory of the case, which was supported by extensive proof, was that Dellinger and Sutton acted in unison with a common purpose and design to kill Griffin. Indeed, the State's theory was that both Appellants fought with Griffin, attempted to bail Griffin out of jail, set fire to Griffin's trailer, transferred the murder weapon from a truck to a car, successfully bailed Griffin out of jail, and then were present while one of them fired the fatal shot. The defense theory for both Appellants was that neither one of them committed the murder. Indeed, much of the defense proof went to establishing that they were friends with Griffin and had no reason to kill him, that Griffin died long after he was last seen with Appellants, and that there were several other possible culprits in this case. Thus, the evidence in the record created an "all or nothing" situation in which Sutton and Dellinger both actively participated and promoted the murder of Griffin or neither one of them did. There is simply no evidence in the record from which a rational jury could conclude that Sutton provided substantial assistance to Dellinger without having the intent to promote or assist the commission of the offense. Therefore, the trial court did not err when it failed to instruct the jury on the lesser included offense of facilitation of a felony. This issue has no merit.

## XXI. SPECIAL INSTRUCTION ON REBUTTAL EVIDENCE

Appellants contend that the trial court erred when it failed to give the jury a special instruction about rebuttal evidence. We conclude that Appellants have waived this issue.

Appellants claim that the trial court should have instructed the jury that it could only consider the State's rebuttal evidence for the impeachment of defense witnesses and it could not consider the testimony as substantive evidence. However, Appellants have failed to provide a specific explanation for why this instruction should have been given. In addition, Appellants have failed to

cite any authority for their proposition that this instruction should have been given and they have also failed to provide a proper citation to the record. Thus, Appellants have waived this issue. Tenn. Ct. Crim. App. R. 10(b).

## XXII. SPECIAL INSTRUCTION ON "LAST SEEN ALIVE"

Appellants contend that the trial court erred when it refused to instruct the jury that it could not convict Appellants simply because Griffin was last seen alive in their presence. We disagree.

The record indicates that the trial court refused to give this special instruction because "the charge sets out very clearly . . . what has to be proven to establish guilt." Indeed, the charge clearly instructs the jury that it can only convict Appellants of an offense if the State proves the elements of that offense beyond a reasonable doubt. In addition, the charge clearly instructs the jury on the elements of first degree murder and its lesser included offenses and the charge also instructs the jury about criminal responsibility for the conduct of another. In short, the charge accurately and correctly instructs the jury on burden of proof, presumption of innocence, elements of the offenses, and the nature of different kinds of evidence. "When the instructions given by the trial judge are a correct statement of the law, and the instructions fully and fairly set forth the applicable law, it is not error for a trial judge to refuse to give a special instruction requested by a party." State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987). This issue has no merit.

## XXIII. CHARGING THE JURY ON SUNDAY

The record indicates that the proof was closed and closing arguments were made on Saturday, August 31, 1996. After the trial court informed the jury that it would be instructed the next day, court was adjourned at 8:55 p.m. Court was resumed at 1:15 p.m. on Sunday, September 1, 1996, and the trial court immediately conducted the hearing about the juror who had been contacted by his ex-wife. Shortly thereafter, the trial court charged the jury. The jury began deliberations at 2:20 p.m. and returned with the verdicts at 7:35 p.m.

Following this Court's decision in State v. Debiasi Sinard King & Dewayne King, No. 03C01-9801-CR-00015, 1999 WL 281080 (Tenn. Crim. App., at Knoxville, April 30, 1999), the Appellants raised the issue of whether the trial court's having instructed the jury on a Sunday coupled with the jury's deliberations and return of verdicts on Sunday required a new trial. In that case this Court held that as late as 1965 the Tennessee Supreme Court reaffirmed the ancient common law rule that judicial proceedings conducted on a Sunday are void. See Smith v. State, 215 Tenn. 314, 385 S.W.2d 748 (1965). As of the time of this Court's decision in King, this rule had not been altered by either the legislature or the Tennessee Supreme Court. Thus, this Court granted a new trial to the defendants in King since a portion of their trial had occurred on a Sunday.

When the Appellants raised this issue by way of a supplemental brief this Court ordered a response by the State. The State responded, conceded that the instant case was indistinguishable from King, but indicated that it was pursuing an appeal to the Tennessee Supreme Court in the King case. The State asked this Court to stay its decision in the instant case until such time as our Supreme Court resolved the issue of the propriety of Sunday court proceedings. Without objection from the Appellants, this Court granted the State's request to stay our opinion in this case until the Tennessee Supreme Court resolved this issue.

On January 19, 2001, the Tennessee Supreme Court handed down its decision in State v. Debiasi Sinard King and Dewayne King, No. E1998-00283-SC-R11-CD, 2001 WL 46244 (Tenn. 2001). In that decision the Court rejected a per se rule invalidating Sunday Court proceedings. The Court held whether to conduct court proceedings on a Sunday rests within the discretion of the trial court. The Court went on to hold:

> In exercising this discretion, the trial court should be deferential to the preferences of the litigants, witnesses, jurors, and attorneys and must be mindful of the need for every participant in a trial proceedings to be prepared and rested. The trial court must also respect and accommodate the genuinely-held religious view of any litigant, witness, juror, or attorney. Finally, the trial court must weigh all of these concerns against whatever pressing need or compelling interest may necessitate a Sunday proceeding.

Id. at * 8

In the instant case the trial had been lengthy and hard fought. The jury had been sequestered. When the trial court proposed giving his instructions to the jury and having the jury deliberate on Sunday the jurors indicated that was fine with them. No attorney or either of the Appellants voiced any objection to the Sunday proceedings. The trial court made appropriate arrangements for jurors who wished to attend religious services. Under these circumstances, we find no abuse of discretion in conducting Sunday court proceedings in the instant case. This issue is without merit.

## XXIV.  USE OF APPELLANTS' CONVICTIONS FOR
## THE BRANAM MURDER IN SENTENCING

Appellants contend that the trial court erred when it allowed the State to introduce their convictions for the Branam murder into the sentencing phase of trial. We disagree.

Appellants contend that because the trial court allowed the State to introduce facts about the Branam murder into evidence in order to establish the identity of Griffin's killers, the trial court should not have allowed the State to introduce Appellants' convictions for the Branam murder during the sentencing phase of trial in order to establish the aggravating circumstance that Appellants had previously been convicted of a felony involving violence to the person.[27] As authority for this proposition, Appellants cite State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994), in which the Tennessee Supreme Court held that when the State is seeking imposition of a death sentence on the basis that the defendant has previously been convicted of a felony involving violence to the person, the State may not introduce evidence about the specific facts of the prior crime during the sentencing phase when the conviction shows on its face that it involved violence to the person. Id. at 811.

We conclude that Appellants' reliance on Bigbee is misplaced. Nothing in Bigbee prevents the State from relying on a previous conviction for a felony involving violence to the person as an

---

[27]Tennessee Code Annotated section 39-13-204 provided that one of the aggravating circumstances that can be used as a basis for imposing a death sentence is the fact that the defendant has previously been convicted of one or more felonies whose statutory elements involve the use of violence to the person. Tenn. Code Ann. § 39-13-204(i)(2) (1991).

aggravating circumstance after the State has introduced the facts of the prior conviction during the guilt phase of trial in order to establish an element of first degree murder. Rather, Bigbee simply precludes the State from introducing the specific facts of the prior offense during the sentencing phase itself. Indeed, the State fully complied with this requirement. The record indicates that the State introduced no evidence about the specific facts of the Branam murder during the sentencing phase and the prosecutors made no mention of the specific facts during their closing arguments. Instead, the State merely used Appellants' convictions to establish that Dellinger had one prior conviction for felonies involving violence against the person and that Sutton had two prior convictions for a felony involving violence to the person.[28] Further, the trial court instructed the jury that in imposing sentence, it could only consider "any of the statutory aggravating circumstances which have been raised during the sentencing phase" and that it "shall not take account of any other aggravating facts or circumstances as the basis for deciding whether the death penalty would be appropriate in this case." The jury is presumed to have followed those instructions. See State v. Nesbit, 978 S.W.2d 872, 885 (Tenn. 1998). Under these circumstances, we conclude that the trial court did not err when it allowed the State to introduce Appellants' convictions for the Branam murder during the sentencing phase. This issue has no merit.[29]

## XXV. THE STATE'S CLOSING ARGUMENT DURING THE SENTENCING PHASE

Appellants contend that the State's closing argument during the sentencing phase was improper and prejudicial. We disagree.

Initially, we note that the record indicates that Appellants did not make a single objection to anything that either of the two prosecutors said during their closing arguments during the sentencing phase. By failing to make a contemporaneous objection, Appellants waived this issue. Farmer, 927 S.W.2d at 591); Tenn. R. App. P. 36(a). However, notwithstanding waiver, we conclude that Appellants are not entitled to relief even on the merits.

Essentially, Appellants claim that the closing arguments of both prosecutors were improper because they included references to the fact that each Appellant had been previously convicted of first-degree murders. As support for this proposition, Appellants cite State v. Smith, 755 S.W.2d 757 (Tenn. 1988) and State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994). However, Smith and Bigbee are clearly distinguishable from this case. In Smith, the Tennessee Supreme Court held that because the jury had been informed that the defendant had received a life sentence for one murder conviction, it was improper for the prosecutor to argue that the jury would be imposing no punishment at all if it imposed another life sentence for the second murder conviction. 755 S.W.2d at 767–68. In

---

[28]The State introduced evidence that Sutton had a prior conviction in Georgia for aggravated assault.

[29]In a related issue, Appellants contend that the trial court erred when it failed to strike the State's notice of intent to seek the death penalty. Specifically, Appellants contend that because the trial court had ruled that the State would be allowed to introduce facts about the Branam murder into evidence in order to establish the identity of Griffin's killers, the trial court should have stricken the State's notice of intent to seek the death penalty because it relied on Appellants' convictions for the Branam murder as the aggravating circumstance upon which the death penalty was sought. For the same reasons that we conclude that the trial court did not err when it allowed the State to introduce Appellants' convictions for the Branam murder into evidence during the sentencing phase, we also conclude that the trial court did not err when it failed to strike the State's notice of intent to seek the death penalty.

Bigbee, the supreme court held that the prosecutor's argument was improper because he had strongly implied that imposition of a death sentence for a second murder conviction would be an appropriate way to punish the defendant for a previous murder conviction for which the defendant received a life sentence. 885 S.W.2d at 812. The prosecutors in this case did neither of these things. First, the prosecutors never mentioned the fact that Appellants had received a life sentence for the Branam murder and they never argued that imposition of a life sentence in this case would be no punishment at all. Second, the prosecutors never stated or implied that imposition of a life sentence for the Griffin murder would be an appropriate punishment for the Branam murder. Instead, the prosecutors only mentioned the Branam murder in the context of arguing that because the State had proven the existence of the aggravating circumstance and had proven that the aggravating circumstance outweighed the mitigating circumstances, the death sentence was the appropriate sentence in this case. There is nothing improper about arguing that the existence of the prior conviction as an aggravating circumstance supports imposition of a death sentence. See id. This issue has no merit.

## XXVI. FAILURE TO INFORM THE JURY ABOUT THE PREVIOUS LIFE SENTENCE

Appellants contend that the trial court erred when it failed to instruct the jury that Appellants had received life sentences for their convictions in the Branam murder case. We disagree.

Appellants concede that under current law, the trial court properly refused to instruct the jury about the sentences in the Branam murder case. Indeed, the Tennessee Supreme Court has specifically held that it is improper to inform a jury in a capital case that the defendant received a life sentence for a previous first degree murder conviction. State v. Smith, 857 S.W.2d 1, 24–25 (Tenn. 1993). This Court has neither the authority nor the desire to overrule the supreme court on this issue. This issue has no merit.

## XXVII. INSTRUCTION ABOUT PROOF OF IDENTITY

Appellants contend that the trial court failed to properly instruct the jury about the State's burden of proof in establishing that Appellants were the same individuals who were convicted of prior felonies involving violence to the person. We disagree.

The record indicates that during the sentencing phase, the trial court instructed the jury that

> The burden of proof is upon the state to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case, and is an inability after such investigation to let the mind rest easily.

The trail court then instructed the jury that in order to show the existence of the aggravating circumstance for Sutton, the State was relying on a Sevier County first degree murder conviction and on a Georgia aggravated assault conviction. The trail court further instructed the jury that in order to show the existence of the aggravating circumstance for Dellinger, the State was relying on a Sevier County first degree murder conviction. Thereafter the trial court gave the following instruction:

> Members of the Jury, the court has read to you the aggravating circumstances which the law requires you to consider if you find beyond a reasonable doubt that the evidence was

established. You shall not take account of any other aggravating facts or circumstances as the basis for deciding whether the death penalty would be appropriate punishment in this case.

As support for their proposition, Appellants rely on Lowe v. State, 805 S.W.2d 368 (Tenn. 1991). However, Lowe is clearly distinguishable from this case. In Lowe, the Tennessee Supreme Court held that the trial court erred when it instructed the jury pursuant to a habitual criminal statute that "a judgment of conviction of any person under the same name as that of the defendant is prima facie evidence that the identity of such person is the same as the defendant" and defined the term "prima facie" to mean that the evidence "is to be taken as an established fact unless and until it is overturned or rebutted by proof." Id. at 371. The supreme court held that the trial court erred because its instruction impermissibly shifted the burden of proof to the defendant. Id. In this case, nothing in the trial court's instructions shifted the burden of proving identity to Appellants. The trial court never informed the jury that it could consider the fact that Appellants were named in the judgements of conviction from the prior cases as prima facie evidence that they had in fact been convicted of the named offenses. To the contrary, the trial court clearly informed the jury that the State had the burden of proving the existence of the aggravating circumstance beyond a reasonable doubt. Thus, the jury was clearly aware that in order to prove that the aggravating circumstance existed, the State had to establish beyond a reasonable doubt that Appellants were the people who had been convicted of the prior felonies involving violence against the person. This issue has no merit.

## XXVIII. PROOF OF APPELLANTS' IDENTITIES

Appellants contend that the State failed to prove the existence of the aggravating factor in this case beyond a reasonable doubt. Specifically, Appellants contend that the State failed to prove that they were the same individuals who were named in the judgments of conviction for the prior felonies. We disagree.

During the sentencing hearing, Scott Greene, Assistant District Attorney General for Sevier County, testified that he was present in the Criminal Court of Sevier County on February 24, 1993. Greene then testified that he was acquainted with James Dellinger and he identified Dellinger on the record. Greene subsequently identified a judgment of conviction for first degree murder in Sevier County case 5035. Greene testified that he had prepared the judgment form and the form had been signed by Judge Rex Henry Ogle. Green then testified that the defendant who was named in the judgment form was James Dellinger, the individual whom he had just identified. Shortly thereafter, the judgment of conviction was admitted into evidence.

Green also testified that he was acquainted with Gary Sutton, and he identified Sutton on the record. Green then identified a document dated February 24, 1993, as a judgment of conviction for first degree murder in Sevier County case 5033. Greene testified that he had also prepared this judgment form and this form had likewise been signed by Judge Rex Henry Ogle. Green then testified that the defendant who was named in the judgment form was Gary Wayne Sutton. Shortly thereafter, the judgment of conviction was admitted into evidence.

Anthony Rollins of the Cobb County, Georgia Sheriff's Department subsequently identified some documents pertaining to indictment number 82-2313. Rollins testified that the name of the person identified in the records was Gary Wayne Sutton and that the records included a photograph

and rolled fingerprint impressions of Gary Wayne Sutton. The documents were then admitted into evidence. One of the documents is a judgment of conviction which indicates that Gary Dewayne Sutton had entered a guilty plea to the charge of aggravated assault as charged in indictment number 82-2313.

Crime Scene Technician Larry Muncy testified that he had previously prepared a card that contained the fingerprints of Appellant Gary Wayne Sutton. Muncy then testified that he had compared the fingerprint card that he had prepared with the fingerprint card obtained from the Cobb County Sheriff's Department and he had concluded that the fingerprints on both cards were from the same individual.

We conclude that the above evidence is sufficient to establish beyond a reasonable doubt that both Appellants had previously been convicted of felonies involving violence to the person. First, the evidence was clearly sufficient to establish beyond a reasonable doubt that Appellant Dellinger had previously been convicted of first degree murder in Sevier County. Greene identified Dellinger, identified the judgment of conviction that he had prepared which showed that James Dellinger had been convicted of first degree murder in Sevier County, and testified that Appellant Dellinger was the same James Dellinger named in the judgment of conviction. Second, the evidence was sufficient to establish beyond a reasonable doubt that Appellant Sutton had previously been convicted of first degree murder in Sevier County. Greene identified Sutton, identified the judgment of conviction that he had prepared which showed that Gary Wayne Sutton had been convicted of first degree murder, and testified that the defendant who was named in the judgment form was Gary Wayne Sutton. Appellant Sutton is correct that Greene did not specifically testify that Appellant Sutton was the same Gary Wayne Sutton named in the judgment of conviction. However, it is obvious from Greene's prior identification of Appellant Gary Sutton, his testimony that he was present in the Criminal Court of Sevier County on February 24, 1993; his testimony that he had prepared the judgment of conviction, and his testimony that the defendant named in the judgment of conviction was Gary Wayne Sutton that Greene was indicating that Appellant Sutton is the same individual that was named in the judgment of conviction for first degree murder in Sevier County.[30] Third, the evidence was clearly sufficient to establish beyond a reasonable doubt that Appellant Sutton had previously been convicted of aggravated assault. The State introduced the judgment of conviction and Muncy testified that he had examined the fingerprints and determined that the individual convicted of aggravated assault was Appellant Sutton. This issue has no merit.

### XXIX. INSTRUCTION ON REASONABLE DOUBT DURING SENTENCING

Appellants contend that the trial court erred when it instructed the jury about reasonable doubt during the sentencing phase of trial. We disagree.

---

[30] In support of his proposition that the State failed to establish beyond a reasonable doubt that he was the same individual who was convicted of first degree murder in Sevier County, Sutton cites State v. Robert Williams, No. 03C01-9302-CR-00050, 1996 WL 146696, at *4–5 (Tenn. Crim. App., at Knoxville, April 2, 1996), in which this Court held that the State failed to establish beyond a reasonable doubt that the defendant had previously been convicted of violent felonies when the State simply admitted judgments of convictions for prior felonies committed by an individual with the same name as the defendant. This case is distinguishable from Williams because in addition to the judgment of conviction, the State introduced the testimony of Greene in which he he identified Sutton and then stated that he had prepared the judgment form.

In its charge to the jury during the sentencing phase, the trial court instructed the jury that

> The burden of proof is upon the state to prove any statutory aggravating circumstance or circumstances beyond a reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case, and is an inability after such investigation to let the mind rest easily.
>
> It is not necessary that the aggravating circumstance or circumstances be proved beyond all possible doubt, as absolute certainty is not demanded by the law.
>
> A reasonable doubt is just that—a doubt that is reasonable after an examination of all the facts of this case.

Appellants contend that this charge was improper in that the use of the phrase "let the mind rest easily" violated their right to due process because the fact that the phrase is not qualified or otherwise explained makes the instruction impermissibly vague and ambiguous.

Tennessee courts have repeatedly upheld the use of the phrase "let the mind rest easily" in instructions about reasonable doubt. In State v. Bush, 942 S.W.2d 489 (Tenn. 1997), the Tennessee Supreme Court held that the trial court did not err when it instructed the jury that

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every element of proof necessary to constitute the offense.

Id. at 520–21. Similarly, in State v. Nichols, 877 S.W.2d 722 (Tenn. 1994), the supreme court held that the trial court did not err when it instructed the jury that it must find proof "beyond a reasonable doubt" and be convinced to a "moral certainty" of the existence of the aggravating circumstances and of the fact that they outweighed the mitigating circumstances in conjunction with an instruction that "[r]easonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict." Id. at 734. The supreme court stated that "[t]he context in which the instruction was given clearly conveyed the jury's responsibility to decide the verdict based on the facts and the law." Id. Further, in Pettyjohn v. State, 885 S.W.2d 364 (Tenn. Crim. App. 1994), this Court held that the trial court did not err when it instructed the jury that

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a captious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every proposition of proof to constitute the offence [sic].
>
> It is not necessary that each particular fact should be proved beyond a reasonable doubt[ ] [i]f enough facts are proved to satisfy the jury beyond a

> reasonable doubt, of all the facts necessary to constitute the crime charged. Before a verdict of guilty is justified that [sic] circumstances taken together must be of a conclusive nature and tendency, leading on the whole to satisfactory conclusion and producing in effect a "moral certainty" that the defendant committed the offence [sic].

Id. at 365–66.

We conclude that, just like the instructions in Bush, Nichols, and Pettyjohn, the instruction in this case was proper because it sufficiently informed the jury about the standard against which it was to examine the evidence. Contrary to Appellants' contention, the fact that the phrase "let the mind rest easily" was not qualified in this case by something such as "to the certainty as to the establishment of the aggravating factor" does not make the statement impermissibly vague. As stated by the supreme court in Bush, "[i]n order to meet the requirements of due process, the jury instructions must be examined as a whole, without considering particular phrases out of context." 942 S.W.2d at 521. It is absolutely obvious that when the phrase "let the mind rest easily" is considered in context, it is referring to the jury's determination, based on a consideration of all the evidence, that the State has satisfied its burden of establishing the existence of the aggravating circumstance and establishing that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt. In short, the trial court's instruction on reasonable doubt properly reflects the evidentiary certainty required by principles of due process. This issue has no merit.[31]

## XXX. FAILURE TO INSTRUCT THE JURY THAT APPELLANTS ARE HUMAN BEINGS

Appellants contend that their death sentences must be vacated because the trial court failed to instruct the jury that Appellants are human beings and that the jury can consider that fact as a mitigating circumstance. We disagree.

In support of their argument that their death sentences must be vacated because the trial court failed to instruct the jury that they are human beings, Appellants cite Tennessee Code Annotated section 39-13-204, which states in relevant part,

> The trial judge shall also include in the instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both, which shall include, but not be limited to, those circumstances set forth in subsection (j). No distinction shall be made between mitigating circumstances as set forth in subsection (j) and those otherwise raised by the evidence which are specifically requested by either the state or the defense to be instructed to the jury. These instructions and the manner of

---

[31]In a related issue, Appellants contend that the trial court erred when it refused to consider their motion challenging the validity of this jury instruction even though the motion was not filed until after the trial court had conducted a hearing on their motion for a new trial and denied the motion for a new trial. However, Rule 33(b) of the Tennessee Rules of Criminal Procedure clearly states that a motion for a new trial must be in writing, must be made within thirty days of sentencing, and amendments to the motion shall be allowed until the day of the hearing on the motion. Thus, the trial court did not err when it refused to consider the motion that was filed after the hearing on the motion for a new trial. In any case, Appellants' challenge to the jury charge has no merit.

arriving at a sentence shall be given in the oral charge and in writing to the jury for its deliberations.

Tenn. Code Ann. § 39-13-204(e)(1) (1991). Appellants argue that because the fact that they are human beings was raised by the evidence, the trial court was required to grant their request to instruct the jury that Appellants are human beings.

The Tennessee Supreme Court has held that the above statute requires a trial court to "instruct the jury on nonstatutory mitigating circumstances when raised by the evidence and specifically requested by either the State or the defendant." State v. Odom, 928 S.W.2d 18, 30 (Tenn. 1996). However, the supreme court has also stated that the right to have the jury instructed on nonstatutory mitigating circumstances is statutory rather than constitutional in nature and thus, the failure to instruct the jury on nonstatutory mitigating circumstances when raised by the evidence is subject to harmless error analysis. State v. Hodges, 944 S.W.2d 346, 351–52 (Tenn. 1997). The supreme court also stated that "in determining whether instructions are erroneous, this Court must review the charge in its entirety and read it as a whole." Id. at 352. "A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. Compare, Brimmer v. State, 29 S.W.3d 497, 520-21 (Tenn. Crim. App. 1998).

Assuming arguendo that the trial court erred when it failed to instruct the jury about the obvious fact that Appellants are human beings, it is absolutely clear that any such error was harmless. The record indicates that the trial court instructed the jury to consider, but not limit its consideration, to twenty mitigating circumstances for Appellant Dellinger and fourteen mitigating circumstances for Appellant Sutton. The trial court then instructed the jury that it could also consider

> Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilty or sentencing hearing; that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.
>
> . . . .
>
> No distinction shall be made between mitigating circumstances listed above and other mitigating circumstances raised by the evidence although not specifically listed.

It is clear that the trial court's failure to instruct the jury that Appellants are human beings did not result in an instruction that "fails to fairly submit the legal issues" or "misleads the jury as to the applicable law." Clearly, the trial court's instruction did not prevent the jury from considering the obvious and readily apparent fact that Appellants are human beings. Indeed, the instruction expressly informed the jury that it could consider anything to be a mitigating circumstance if it was raised by the evidence. Further, the very nature of every one of the specific mitigating circumstances that were listed necessarily encompassed the fact that Appellants are human beings. In short, we conclude that even if the trial court erred when it failed to instruct the jury that Appellants are human beings, it is absolutely clear that any such error was harmless. See Tenn. R. Crim. P. 52(a). This issue has no merit.

## XXXI. FAILURE TO ANSWER THE JURY'S QUESTION

Appellants contend that the trial court erred when it failed to answer the jury's question about whether life sentences in this case would run concurrently with or consecutively to life sentences imposed for the Sevier County first degree murder convictions.[32] We disagree.

At some point during deliberations in the sentencing phase, the jury submitted the following written question to the trial court:

If James Dellinger and Gary Sutton were given life in prison from Sevier County and they are given life in prison in Blount County—will the prison terms be consecutive and/or concurrent.

The trial court gave the following written response: "You should concern yourself with the sentences in these cases only."

Appellants have cited no authority for their proposition, and we conclude that the trial court acted properly. In State v. Smith, 857 S.W.2d 1 (Tenn. 1993), the Tennessee Supreme Court held that the trial court acted properly when it refused to answer the following questions from the jury:

(1) Define life sentence;
(2) Define consecutive and concurrent life terms and which would apply if a second life sentence was given;
(3) When would parole apply.

Id. at 10–11. The supreme court stated that the trial court's refusal to answer the questions was proper because providing a jury with this sort of information could result in death sentences that are based on sheer speculation and on factors other than those enumerated in the governing statutes. Id. at 11. Similarly, if the trial court had answered the jury's question in this case, this could have encouraged the jury to base its decision on whether to impose death sentences on speculation about what may happen in the future rather than on the factors delineated by the death penalty statutes. Thus, we conclude that under Smith, the trial court properly refused to answer the jury's question. This issue has no merit.

## XXXII. WHETHER THE AGGRAVATING FACTOR APPLIED BY THE JURY IS A DUPLICATION OF THE CRIME

Appellants contend that their death sentences are unconstitutional because the aggravating circumstance applied by the jury is a duplication of the offence for which they were convicted. We disagree.

Although Appellants' argument is not entirely clear, they apparently contend that because the State used evidence of the Branam murder to show that they were the individuals who killed Griffin, the State was precluded from relying on their convictions for the Branam murder as the aggravating circumstance upon which the death penalty was sought. As support for this proposition, Appellants cite State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). This reliance is completely misguided. In Middlebrooks, the Tennessee Supreme Court held that when a defendant is convicted of first degree murder solely on the basis of felony murder, the defendant cannot be sentenced to

---

[32]Appellants claim that this alleged error was compounded by the trial court's failure to inform the jury that life sentences would be imposed in this case if the jury failed to reach a unanimous verdict. However, the Tennessee Supreme Court has expressly rejected the argument that a jury should be informed of the result of a non-unanimous verdict. See State v. Cribbs, 967 S.W.2d 773, 796 (Tenn. 1998).

death because that same murder was committed during the commission, the attempt to commit, or the fleeing after the commission or attempt to commit certain felonies. Id. at 347. First, Appellants were convicted of premeditated and deliberate first degree murder, not felony murder. In addition, Appellants were convicted in this case of the Griffin murder, not the Branam murder. Thus, it is obvious that the aggravating circumstance in this case (the convictions for the Branam murder) was not a duplication of the crime for which Appellants were convicted in this case (the Griffin murder). This issue has no merit.

## XXXIII. DOUBLE JEOPARDY

Appellants contend that the imposition of the death sentence in this case violates principles of double jeopardy. We conclude that Appellants have waived this issue.

Appellants have failed to support their contention with any argument other than a one sentence conclusory statement that their death sentences violate principles of double jeopardy. In addition, Appellants have failed to cite to the record and they have failed to cite any authority in support of their claim. Thus, this issue is waived. Tenn. R. Ct. Crim. App. 10(b).

## XXXIV. FAILURE TO CONDUCT AN ADDITIONAL SENTENCING HEARING

Appellants contend that the trial court erred when it failed to hold a separate sentencing hearing to determine whether their death sentences should be served concurrently with or consecutively to their life sentences for the Branam murder. We disagree.

Appellants have not cited any authority that would support their proposition that the trial court was required to conduct a separate sentencing hearing. Indeed, the statutes that govern capital sentencing do not provide for such a hearing. Quite simply, nothing in the law of this State required the trial court to conduct a separate sentencing hearing and thus, the court did not err in failing to do so. This issue has no merit.[33]

## XXXV. SENTENCE REVIEW PURSUANT TO TENNESSEE CODE ANNOTATED SECTION 39-13-206(c)(1)(1997).

In all cases involving the sentence of death Tennessee Code Annotated Section 39-13-206(c)(1)(1997) requires that the appellate courts determine whether:

(A)    The sentence of death was imposed in an arbitrary fashion:

(B)    The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C)    The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and

---

[33]We note that because the judgments in this case do not expressly indicate whether the death sentences are to be served concurrently with or consecutively to the previously imposed sentences, the death sentences are to run concurrently with the other sentences. Tenn. R. Crim. P. 32(c)(2).

(D)     The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Initially we note that there is nothing in this record to indicate that the sentence of death was imposed arbitrarily. All appropriate statutory sentencing procedures were utilized and the jury was properly instructed concerning how to reach its decision as to punishment. Secondly, as discussed previously herein, the evidence is amply sufficient to support the jury's finding that the appellants had previous convictions involving violence thereby establishing the aggravating circumstance found at Tennessee Code Annotated Section 39-13-204(i)(2). Thirdly, the mitigating evidence consisted largely of testimony concerning the appellants' troubled lives, injuries, and personal setbacks. Contrasted with this was proof that the appellants had previously been convicted of a violent felony involving a death. The jury was justified in determining the aggravating circumstance outweighed the mitigating proof offered in this case.

Finally, we discuss whether the sentence of death is proportional in this case when compared to similar cases. This analysis is designed to identify aberrant, arbitrary or capricious sentences by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." State v. Bland, 958 S.W.2d at 662 (Tenn. 1997). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. Id. at 668. However, a sentence of death is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant has received a life sentence. Id. at 665. "Since no crimes are precisely alike, the precedent seeking method of review is not a rigid, mechanical formula." State v. Burns, 979 S.W.2d 276, 283 (Tenn. 1998). Instead, we consider numerous factors regarding the offense itself: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667. We also consider numerous factors about the defendant: (1) age, race and gender; (2) prior criminal record; (3) mental, emotional, or physical condition; (4) role in the murder; (5) remorse; (6) cooperation with authorities; (7) the defendant's knowledge of a victim's helplessness; and (8) the defendant's potential for rehabilitation. Id.

The evidence in this case showed that after an afternoon spent drinking with Griffin, Appellants became angry with Griffin, fought with him, and abandoned him on the side of a highway. After a subsequent unsuccessful attempt to obtain Griffin's release from jail, Appellants set fire to Griffin's residence and then obtained a shotgun. Appellants then obtained Griffin's release from jail, took him to a remote area, and shot him in the back of the head with a shotgun. Appellants have continued to deny all responsibility for Griffin's murder and they have failed to show any remorse for the senseless and unprovoked killing of their supposed friend. The jury sentenced the Appellants to death after it found one aggravating circumstance: that the Appellants had previously been convicted of felonies involving the use of violence to the person.

In State v. Cribbs, 967 S.W.2d 773 (Tenn. 1998), the defendant killed a woman after the woman and her husband came home while the defendant and an accomplice were burglarizing their home. The defendant shot the husband in the shoulder, causing him to lose consciousness. The

defendant then killed the wife by placing a shotgun against her head and firing. The jury imposed the death sentence after it found two aggravating circumstances: that the defendant was previously convicted of one or more felonies involving violence to the person and that the murder was committed while the defendant was engaged in committing or was attempting to commit a burglary. The supreme court held that the second aggravating circumstance was invalid, but upheld the death sentence based on the aggravating circumstance that the defendant had previously been convicted of felonies involving violence to the person.

In State v. Hurley, 876 S.W.2d 57 (Tenn. 1993), the defendant killed the victim by shooting him once in the head. The jury found the defendant guilty of premeditated murder and imposed the sentence of death upon finding one aggravating circumstance: that the murder was committed while the defendant was engaged in committing a robbery. The supreme court upheld the death sentence.

In State v. Howell, 868 S.W.2d 238 (Tenn. 1993), the twenty-seven-year-old defendant murdered the clerk of a convenience store by shooting him once in the head during the course of a robbery. The defendant did not cooperate with the authorities and he did not express remorse. The defendant presented evidence that he had been diagnosed as a slow learner, had been placed in special education classes, and had dropped out of school in the eighth grade. The jury found the defendant guilty of first degree felony murder and sentenced him to death upon finding two aggravating circumstances: that the defendant had previously been convicted of felonies involving the use of violence to the person, and the murder was committed while the defendant was engaged in committing a felony. The supreme court found that the jury's reliance upon the felony murder aggravating circumstance was invalid, but upheld the death sentence based on the aggravating circumstance that the defendant had previously been convicted of felonies involving the use of violence to the person.

In State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993), the defendant killed a seventy-four-year-old victim in the course of a robbery. The victim had been shot once and was lying on the floor when the defendant shot her in the head. The defendant was age nineteen and had no prior record. Mitigating evidence included the defendant's good work record, cooperation with law enforcement, remorse, and educational problems. The jury imposed the death sentence after finding one aggravating circumstance: that the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. The supreme court upheld the death sentence.

In State v. Smith, 695 S.W.2d 954 (Tenn. 1985), the defendant robbed and killed a man by shooting him twice. The defendant confessed to the police. The jury sentenced the defendant to death after it found that one aggravating circumstance: that the defendant committed the murder during the perpetration of a robbery. The supreme court upheld the death sentence.

In State v. Caldwell, 671 S.W.2d 459 (Tenn. 1984), the defendant and the victim were engaged in a drinking bout that erupted into violence when the victim threw whiskey into the defendant's face. The defendant then shot the victim twice in the back of the head with a shotgun. The jury sentenced the defendant to death after it found that one aggravating circumstance: that the defendant had been previously convicted of felonies involving the use of violence to the person. The supreme court upheld the death sentence.

These cases, although not identical, contain numerous similarities to both the offense and the defendants before us. As is the case here, only one aggravating circumstance was validly considered

in all six of the above cases and in three of the cases, the aggravating circumstance was the same one that the jury found was present in this case. In this case, Griffin was shot once in the head. In all six of the above cases, the victim was only shot once or twice and in five of the cases, the victim was shot in the head. Just as Griffin was shot while he was unarmed, the victims in all six of the above cases were apparently also unarmed. Just as there was evidence that Appellants have a low IQ level, there was evidence that the defendants in Howell and Van Tran had impaired mental abilities or educational problems. Like the defendant in Howell and unlike the defendant in Van Tran, Appellants have never accepted responsibility or expressed remorse for their crime. Finally, the supreme court upheld the death penalty in all six of the above cases after finding that it was neither arbitrary nor disproportionate. After reviewing the cases discussed herein, and other cases not herein detailed, we conclude that the penalty imposed by the jury in this case is not excessive or disproportionate to the penalty imposed for similar crimes. This issue has no merit.

## XXXVI. CONCLUSION
Based on the foregoing the judgment and sentence of the trial court is AFFIRMED.

_____
JERRY L. SMITH, JUDGE